**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Petitioner, Appellant**

v.

**Ronald W. LOVE, Defendant,**

**Mary Anderson, et al., Respondents.**

**No. C7–89–1268.**

Supreme Court of Minnesota.

Aug. 31, 1990.

 

---

**1.** *Edquist v. Browning-Ferris,* 380 N.W.2d 787     (Minn.1986).

Kay Nord Hunt, Philip A. Cole, Lommen, Nelson, Cole & Stageberg, Minneapolis, for appellant.

Robert J. Hajek, Warchol, Berndt & Hajek, Minneapolis, for respondents.

SIMONETT, Justice.

This case asks whether sexual conduct between a licensed psychologist and his patient, under circumstances where transference has occurred, may give rise to a claim by the patient which is covered under the therapist's professional liability policy. We hold that it may and affirm the court of appeals.

Defendant Ronald Love is a licensed psychologist practicing in the areas of marital therapy and behavior modification. In December 1985 Dr. Love began counseling Mary Anderson for marital difficulties and also for problems relating to being sexually abused as a child. In March 1986, Dr. Love began counseling the patient's husband, Robert, as well.

According to Dr. Love, sometime after Mary began counseling, she began asking him personal questions and became flirtatious, telling the doctor that she thought of him all the time. Mary stated, "I felt that he liked me, so I felt that I had to be sexual." In late May or early June 1986, sexual contacts began between them. Thereafter, for about 2 months, the couple engaged in sexual intimacies at the Counseling Center, at an apartment to which the doctor had access, at a park, in a car, and at the Anderson home. Eventually, on June 20, 1986, they were discovered by Mary's husband in the apartment. Dr. Love and Mary stopped seeing each other in late July 1986, although they continued to talk on the telephone for 3 more weeks.

Dr. Love says he did not consider their relationship to be that of therapist and patient and that he so told Mary. He claims that subsequent meetings between them at the office were on a nonprofessional basis; and, indeed, after the first intimacy Dr. Love stopped billing the Andersons for their sessions. Mary, however, testified she believed the patient-therapist relationship was continuing, even when they met outside the office. Dr. Love had only one therapy session with Robert after the sexual contact with Mary began. Dr. Love admitted his sexual relationship with Mary "[b]asically eliminated my effectiveness and helpfulness as possible ongoing therapy basis [sic]."

Mary and Robert commenced a lawsuit against their therapist alleging negligence, breach of contract, psychotherapy malpractice, and infliction of emotional distress. Dr. Love tendered defense of the lawsuit to his professional liability insurance carrier, St. Paul Fire & Marine Insurance Company. The policy reads, "We'll pay amounts you're legally required to pay for damages resulting from: * * * Professional services that you provided or should have provided."

The insurance company denied coverage on the ground the claims did not result from professional services, and commenced this declaratory judgment action to resolve the coverage issue. After depositions were taken, plaintiff St. Paul moved for summary judgment. In opposition to the motion, defendants also submitted the affidavit of a licensed psychologist who was of the opinion that the psychological phenomena known as transference and countertransference had occurred and that Dr. Love had mishandled the transference.

The trial court ruled there was no coverage for the claims of Mary and her husband and granted plaintiff St. Paul Fire & Marine summary judgment. The court of appeals reversed. *St. Paul Fire & Marine Ins. Co. v. Love,* 447 N.W.2d 5 (Minn.App. 1989). We granted the petition of St. Paul Fire & Marine for further review.

The issue, then, is whether a claim for damages arising out of a patient's sexual relationship with her treating psychologist can ever be a claim for damages resulting

from professional services provided or which should have been provided.

The starting point for our discussion is *Smith v. St. Paul Fire & Marine Ins. Co.,* 353 N.W.2d 130 (Minn.1984). In that case, with similar policy language, we held that there was no coverage for claims against a medical doctor who took sexual liberties with three young boys whom he was treating for assorted medical problems. The boys were young, impressionable, quite sexually naive, and they thought, so they said, that the doctor's improper actions were somehow related to their medical treatment or examination. *Id.* at 133 (dissenting opinion). We held that the doctor's acts of sexual contact did not involve the providing or withholding of professional services. St. Paul argues that *Smith* governs, while the claimant patients contend this case is different. Mary argues her claim is based on Dr. Love's failure to provide proper professional services, *i.e.,* his mishandling of the transference phenomenon, resulting in a sexual relationship harmful to Mary which aggravated her preexisting emotional disorder.

To better understand this case, we need to describe transference. This phenomenon is "[t]he process whereby the patient displaces on to the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly." S. Waldron–Skinner, *A Dictionary of Psychotherapy* 364 (1986). Transference is common in psychotherapy. The patient, required to reveal her innermost feelings and thoughts to the therapist, develops an intense, intimate relationship with her therapist and often "falls in love" with him. The therapist must reject the patient's erotic overtures and explain to the patient the true origin of her feelings. A further phenomenon that may occur is countertransference, when the therapist transfers his own problems to the patient. When a therapist finds that he is becoming personally involved with the patient, he must discontinue treatment and refer the patient to another therapist.[1]

"The medical and legal communities uniformly agree that a psychiatrist's mishandling the transference phenomenon during treatment and taking sexual advantage of his patient is malpractice or gross negligence." Louisell & Williams, 2 *Medical Malpractice* ¶ 17A.27, at 85–86 (and cases therein cited) (1989). Our inquiry here, however, is not whether Dr. Love may be liable to his patient but whether there is insurance coverage for the liability, if proven.[2] St. Paul has limited its coverage to claims "resulting from [p]rofessional services provided or which should have been provided."[3]

We must, therefore, look to the conduct which results in the patient's claim. If, in Mary's case, we look no further than the therapist's sexual acts (as the insurer argues), obviously there is no coverage, but we are then ignoring the professional treatment that preceded and accompanied the sexual conduct. On the other hand, if we look only at the treatment which should have been given and was not (as the patient

---

**1.** We use the term "therapist" in this opinion to refer to a psychologist or psychiatrist, or, at times, to other professionals who hold themselves out as engaging in psychotherapy or counseling therapy for marital, family and sexual problems.

A sexual relationship may, of course, result between a female therapist and a male patient, such as in *Weaver v. Union Carbide Corp.,* 378 S.E.2d 105 (W.Va.1989). Most cases of sexual involvement, however, involve a female patient and a male therapist; consequently, in discussing the transference phenomenon generally, we do so in that context. On the general nature of transference, see, *e.g.,* Coleman, *Sex Between Psychiatrist and Former Patient: A Proposal For a "No Harm, No Foul" Rule,* 41 Okla.L.Rev. 1

(1988), and authorities therein collected and discussed.

**2.** For example, it appears there is an issue of fact whether the sexual conduct alleged to have caused the harm to the plaintiff occurred within the professional relationship.

**3.** Like most professional liability policies, St. Paul's policy does not contain an intentional act exclusion. Given the nature of the risks covered by a professional liability policy, such an exclusion is not very workable. Rather the insuring clause itself, limiting coverage to "professional services," acts as its own limitation on coverage. Appleton, 7A *Insurance Law and Practice* § 4504.01 (1979).

proposes), we ignore the sexual acts. Either focus puts on blinders. In determining whether the patient's claim results from professional services provided or which should have been provided, we believe the focus must be on the therapist's entire conduct. The question then becomes whether the sexual aspect of that conduct is inextricably related to the professional services provided or withheld. If the linkage is absent or slight, the patient's claim cannot be said to result from professional services provided or withheld. On the other hand, if there is a substantial connection, the claim results from the professional services, and the sexual conduct is seen as a consequence of those services provided or withheld. In applying this test, the factors to be considered include the patient's health problem, the nature of the professional services involved, and how the sexual conduct arises within the context of the patient's problem and the prescribed treatment.

In *Smith*, for example, the patients' problems were, respectively, a heart condition, a groin injury, and a knee injury. The professional services involved consisted of the "medical treatment of a physical ailment by the insured [medical] doctor." *Id.*, 353 N.W.2d at 132. Except in the remote sense that the doctor used his professional role and authority status as an occasion and pretext to take advantage of his patients, his sexual acts had absolutely nothing to do with either the patients' problems or the prescribed medical treatment. The doctor indulged in sex for personal reasons undiluted by any treatment considerations. Consequently, this court held that the damages from the sexual conduct did not result from treatment provided or withheld.

While Mary's case now before us also involves sexual exploitation, we think it differs greatly from *Smith*. Here the patient has an emotional and sexual problem and the professional services were to treat that very problem. The harm for which the patient claims damages, moreover, was related to the problem for which treatment was sought and provided. Ordinarily, if a medical doctor, such as in *Smith*, engages in sexual conduct with the patient, the patient's physical injuries and condition are not made worse; despite the personal relationship, the medical doctor can still properly treat the physical condition. Here, however, the claim is that the therapist's sexual acts worsened the patient's condition for which treatment was sought. This suggests, we think, a "failure on the part of the insured doctor [therapist] to discover or treat an ailment that should have been discovered or treated." *Smith*, 353 N.W.2d at 132.

In this case there is an ailment or condition peculiar to the therapist-patient relationship that required therapy treatment. As we have noted, the professional services provided by a therapist require him to enter into a therapeutic alliance with the patient that invariably induces love-transference. Transference, of course, occurs at times in other relationships including that of medical doctor and patient, but the therapist alone elicits transference as a regular, accepted part of his practice in treating marital and sexual disorders. *See Simmons v. United States*, 805 F.2d 1363, 1365 (9th Cir.1986). The therapist must encourage the patient to express her transferred feelings, while rejecting her erotic advances; at the same time, he must explain to the patient that her feelings are not really for him, but that she is using him in a symbolic role to react to some other significant person in her life. In short, the therapist must both encourage transference and discourage certain aspects of it. This may be difficult to do and presents an occupational risk.[4] The therapeutic alliance in this situation gives rise to a duty, imposed by professional standards of care as well as by ethical standards of behavior, to refrain from a personal relationship with the patient, whether during or outside therapy sessions. This is because the personal

4. "Further, the necessary intensity of the therapeutic relationship may tend to activate sexual and other needs and fantasies on the part of both patient and therapist, while weakening the objectivity necessary for control." American Psychiatric Association, *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry*, § 2.1 (1985) (p. 17A–7a).

relationship infects the therapy treatment, rendering it ineffective and even harmful.

When sexual conduct occurs in this setting, it seems to us best understood as inextricably related to the dynamics of the therapeutic relationship. The sexual conduct, to be sure, is aberrant and unacceptable, but it is so related to the treatment contemplated that it comes within the scope of the insurance coverage for professional services provided or withheld.

We suppose a therapist might take sexual advantage of a patient without transference being present. In such a case, much like the medical doctor in *Smith*, the sexual conduct might well lie outside professional services. *Cf. Washington Ins. Guaranty Ass'n v. Hicks*, 49 Wash.App. 623, 628, 744 P.2d 625, 627 (1987) (no coverage for chiropractor where, like in *Smith*, transference is not an important aspect of chiropractic). Here, however, where transference is a treatment phenomenon, it is no more incongruous for the professional liability carrier to insure the therapist against the risk he may not abstain from a sexual relationship with a patient, than it is for the auto liability carrier to insure a driver against the risk he may not abstain from exceeding the speed limit or driving while drunk.

Other jurisdictions have also found insurance coverage in similar cases. *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 462, 362 N.W.2d 174, 178 (Wis.Ct.App. 1984), *review denied*, 122 Wis.2d 783, 367 N.W.2d 223 (1985) ("a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them"); *Vigilant Ins. Co. v. Employers Ins. of Wausau*, 626 F.Supp. 262, 266 (S.D. N.Y.1986) (because of transference, the psychiatrist's sexual acts with his patient are "sufficiently related" to professional services covered by the policy); *St. Paul Fire & Marine Ins. Co. v. Mitchell*, 164 Ga.App. 215, 218–19, 296 S.E.2d 126, 128–29 (1982) (allegation that psychiatrist mishandled transference and had a romantic liaison with patient sufficient to bring suit within insurer's duty to defend); *Zipkin v. Freeman*, 436 S.W.2d 753, 761–62 (Mo.

1968) (psychiatrist, by engaging in sexual exploitation of patient, mishandled transference, so that the patient's claim resulted from professional services covered by the policy). *Cf. Hartogs v. Employers Mutual Liability Ins. Co.*, 89 Misc.2d 468, 391 N.Y. S.2d 962 (N.Y.Sup.Ct.1977); *Aetna Life & Cas. Co. v. McCabe*, 556 F.Supp. 1342 (E.D. Pa.1983).

When, therefore, the transference phenomenon pervades the therapeutic alliance, we believe the sexual conduct between therapist and patient arising from the phenomenon may be viewed as the consequence of a failure to provide proper treatment of the transference. In other words, the patient's claim results from the providing of improper professional services or the withholding of proper services.

Psychotherapy purports to concern itself with emotional and sexual dysfunction, and the insurance company agrees to provide coverage for the risks inherent in the services provided by therapists. The occupational hazards attendant on transference are such a risk. If the underwriter does not want to provide coverage for this particular peril, it would seem it might exclude any claim for damages based on professional services in the treatment of transference which results in a sexual relationship between the insured and the patient.

The husband Robert's claim is also covered by the policy. The husband, too, was a patient of Dr. Love. The therapist's mishandling of the wife's transference impaired the professional services owed the husband. *See Horak v. Biris*, 130 Ill. App.3d 140, 146–47, 85 Ill.Dec. 599, 604, 474 N.E.2d 13, 18 (1985).

Affirmed.

COYNE, Justice (dissenting).

I dissent. It seems to me that the majority has forgotten the nature of an insurance policy. It is a contract between insurer and insured and the scope of its coverage is dependent upon their intent; the complainant is not a party and has no interest in the policy. The policy with which we are here concerned is a policy of liability insurance in which St. Paul Fire & Marine

Insurance Company promises to pay only those amounts Ronald W. Love is legally required to pay for damages resulting from professional services Love, a licensed psychologist, provided or should have provided. The vulnerability of the victim is not the criterion for determining the ambit of insurance coverage. No matter how sympathetic we may be toward the victim's plight, our limited role on appeal is to determine the insurance contract's meaning as intended by Love and the insurer. *Smith v. St. Paul Fire & Marine Ins. Co.*, 353 N.W.2d 130 (Minn.1984). I cannot believe that either St. Paul F & M or Love intended or anticipated that the insurer should pay on Love's behalf for damages he caused by stepping out of his professional role and deliberately and intentionally engaging in conduct flagrantly violative of professional ethics, reprehensible, and, perhaps, criminal. Minn.Stat. § 609.36 (1988). Until today this court has recognized that the opportunity presented by a professional relationship for acts of sexual contact for the satisfaction of the insured professional's prurient interests does not involve professional services provided or which should have been provided. *Smith*, 353 N.W.2d at 132.

The majority implies that because this patient appeared on the therapist's doorstep with a sexual vulnerability, the subsequent sexual contact must fall within the provision of professional services, saying that the claim that "the therapist's sexual acts worsened the patient's condition for which treatment was sought" suggests a " 'failure on the part of the insured doctor [therapist] to discover or treat an ailment that should have been discovered or treated.' " Majority slip op. at 701 (quoting *Smith*, 353 N.W.2d at 132). Notwithstanding, however, that the plaintiff has couched the titles of the several counts of her complaint in terms of negligence and breach of contract as well as the intentional infliction of harm, the thrust of the complaint has nothing to do with the discovery or treatment of her ailment. Rather, the crux of each and every count of the complaint—the language describing the acts causing the plaintiff's injury—is exactly the same:

"Defendant Love willfully and knowingly induced Plaintiff to attempt sexual intercourse with him at which time Defendant Love willfully and knowingly penetrated her." That is the allegation of an intentional tort, not the failure to discover or treat the patient's malady.

In order to bring Love's outrageous behavior within the policy coverage, the majority resorts to professional jargon, characterizing Love's conduct as the "mishandling of the transference phenomenon", which the majority declares to be an occupational hazard. *Id.* The rationale is defective, it seems to me, on two levels. In the first place the assumption is that the "transference phenomenon" is unique to the relationship between a therapist (either a psychologist or a psychiatrist). However, it is certainly not unheard of for a patient to fall in love with a surgeon who has relieved a physical problem or a family doctor or gynecologist or lawyer consulted in regard to marital problems. Neither is it unheard of for the physician or the lawyer to fall in love with the patient. I am unaware of the conduct of any of those professionals having been characterized as the "mishandling of the transference phenomenon" or succumbing to an occupational hazard. Until now, such circumstances have always been recognized for what they are—conduct removed from the professional relationship. While the majority finds the extension of coverage to Love's misconduct no more incongruous than insuring a driver against the risks inherent in exceeding the speed limit or driving while drunk, the comparison seems to me both incongruous and foolish. The driver, though negligent, does not intend a collision. The therapist, on the other hand, commits an intentional tort. A more apposite example might be to say that the presence of money subjects a bank teller to the occupational hazard of embezzlement; but, of course, that risk has not heretofore been insurable.

In the second place the majority's position requires expansion of the definition of "professional services" well beyond its ordinary meaning. The majority premises coverage on the absence of an express ex-

clusion of coverage for "this particular peril"—i.e., the "mishandling of the transference phenomenon." *Id.* at 702. Surely, the majority cannot be declaring that an insurer must identify and specifically exclude from coverage every wrongful act which could conceivably be alleged to fall within the scope of "professional services" as that term is now defined by this majority. Yet the majority's analysis requires precisely that conclusion. The commonly understood meaning of the term "professional services" means the services of one engaged in one of the learned professions or in an occupation requiring a high level of training and proficiency. It connotes services promoting the welfare of the client or patient. A deliberate intentional tort can hardly fall within that definition and here Love himself acknowledges that he stepped outside of his professional role when he engaged in intimate sexual contact with his client. Accordingly, I find shocking the majority's attempt to distinguish *Smith* as a case in which the "doctor indulged in sex for personal reasons undiluted by any treatment considerations" when Love agrees that his intimate sexual contact with his client was for personal reasons which had nothing to do with any treatment considerations. Majority slip op. at 701.

At a time when most professions are expending much time and effort in an attempt to eliminate instances of professional misconduct, this majority not only justifies it but permits the miscreant to escape the piper's bill by burdening a third party with its payment.

KELLEY, Justice (dissenting).

I concur with the dissent of Justice Coyne.

KEITH, Justice (dissenting).

I concur with the dissent of Justice Coyne.