**ST. PAUL FIRE & MARINE INSURANCE COMPANY,**
Respondent,

v.

**Hideo D. MORI, M.D., Defendant (C0–91–2472), Respondent (C4–92–265),**

**S.M., Respondent (C0–91–2472), Appellant (C4–92–265),**

**N.N., et al., Appellants (C0–91–2472), Respondents (C4–92–265).**

**Nos. C0–91–2472, C4–92–265.**

Court of Appeals of Minnesota.

June 23, 1992.

Review Denied Aug. 4, 1992.

Richard J. Thomas, Geraghty, O'Lough-
lin & Kenney, St. Paul, for St. Paul Fire &
Marine Ins. Co.

Joel M. Anderson, Dawn M. Mondus, Joel
M. Anderson & Associates, White Bear
Lake, for S.M.

Michael W. Gill, William P. Skemp, La
Crosse, Wis., for N.N., et al.

Considered and decided by CRIPPEN,
P.J., and SCHUMACHER and SCHULTZ,*
JJ.

## OPINION

SCHUMACHER, Judge.

Appellants S.M., N.N. and her husband,
A.N., commenced actions against Dr. Hideo
Mori, alleging sexual abuse.  S.M. and
N.N. were patients of Mori.  S.M. com-
menced her action in Ramsey County; N.N.
and A.N. commenced their action in Mower
County.

Mori's professional liability insurer, re-
spondent St. Paul Fire & Marine Insurance
Company, commenced a declaratory judg-
ment action in Ramsey County seeking a
determination that it was not obligated to
pay any judgments against Mori.  St. Paul
Fire moved for summary judgment.  N.N.
and A.N. opposed the motion for summary
judgment; S.M. moved for summary judg-
ment in her favor in response to St. Paul
Fire's motion.  The trial court granted St.

---

* Retired judge of the district court, acting as
judge of the Court of Appeals by appointment
pursuant to Minn. Const. art. VI, § 2.

Paul Fire's motion for summary judgment. We affirm.

## FACTS

Mori practiced in Grand Meadow, Minnesota. A board certified family practitioner, Mori treated S.M. and N.N. for a variety of problems, including psychological counseling.

*Facts in N.N.*

N.N. was first treated by Mori on November 11, 1960. At the time of this first visit, N.N. was a 17–year–old high school student. She saw Mori for problems associated with a cold, sore throat, fever, irregular menstruation and cramps. Mori conducted a pelvic examination. N.N., who had never received gynecological care prior to this time, did not know what a proper pelvic examination involved. During the course of his examination, Mori digitally penetrated N.N. Mori told N.N. this was necessary because she was a virgin and "small" and he needed to stretch her to do a proper examination. N.N. saw Mori on two further occasions in November of 1960. During these next two visits, Mori again digitally penetrated N.N.

In December of 1960, N.N. was hospitalized for bleeding ulcers. During N.N.'s hospitalization, Mori came into her private room and told her that her ulcers were caused by sexual frustration and inability to climax. Mori advised N.N. that he could treat the underlying source of her problem. N.N. claims Mori again digitally penetrated her and also massaged and kissed her breasts. N.N. interpreted Mori's actions as an exceptional effort to help cure her.

From December 1960 through January 1962, Mori continued to massage N.N.'s clitoris and vagina, stating that this conduct was necessary to avoid the return of ulcers caused by sexual frustration and need to climax. In January of 1962, Mori attempted to penetrate N.N. with his penis during an examination. Mori told N.N. that he thought she might like to experience what a penis feels like.

N.N. returned to see Mori in September of 1962. She came to him because she was pregnant. During these sessions, Mori massaged N.N.'s pelvic area with his hand. These sessions were shorter in duration than the previous sessions had been, lasting no more than one or two minutes. According to N.N., these shorter manipulation sessions lasted until 1982.

In January of 1961, Mori began counseling N.N. for emotional problems. These counseling sessions were separate appointments which lasted approximately 20 minutes. At the end of the counseling sessions, Mori would indicate the need to check N.N.'s cervix or ovaries. During the ensuing pelvic examination, Mori would proceed to manipulate N.N. He indicated the purpose of this manipulation was to enable N.N. to overcome her frustrations, to stretch her, to relieve her sexual inhibitions, and to prevent the return of ulcers. In addition, Mori also prescribed psychotropic drugs for N.N.'s emotional problems.

N.N. and her husband, A.N., sued Mori in Mower County. In their complaint, they allege that as a result of Mori's inappropriate sexual conduct, N.N. sustained psychological and emotional injuries, became drug and alcohol dependent, attempted suicide and developed numerous physical ailments.

The complaint asserted four causes of action, including medical malpractice. In July of 1991, the trial court determined that each cause of action was barred by the applicable statute of limitations. The trial court granted N.N. and A.N. leave to amend their complaint to assert a claim pursuant to Minn.Stat. § 541.073 (Supp. 1989), which provides:

> An action for damages based on personal injury caused by sexual abuse must be commenced, in the case of an intentional tort, within two years or, in the case of an action for negligence, within six years of the time the plaintiff knew or had reason to know that the injury was caused by the sexual abuse.

*Id.* The amended complaint asserted claims for sexual abuse by a health care professional, sexual abuse during psychotherapy, sexual abuse of an emotionally dependent patient, sexual abuse by thera-

peutic deception and a claim by A.N. for loss of consortium.

*Facts in S.M.*

S.M. first saw Mori in 1973, when she sought treatment from him for depression. In addition, S.M. had her routine pelvic examinations performed by Mori beginning in 1973. Prior to 1973, S.M. had not undergone a pelvic examination; thus, she did not know what a proper pelvic examination entailed.

In January of 1976, S.M. sought help from Mori regarding infertility problems. In addition, in 1976 Mori treated S.M. for ovarian cysts. On one occasion, S.M. saw Mori for a pelvic exam when she believed she had a cyst rupture on her ovary. During this examination, Mori manually manipulated S.M. to climax. He told her she was too tense and needed to relax. S.M.'s knees began to shake and she began to cry; Mori again told her to relax.

S.M. continued to see Mori for treatment of her depression following this incident. As part of his treatment, Mori prescribed anti-depressants, including Elavil and Lithium. While on these prescribed drugs, S.M. became anorexic, depressed and suicidal. At one point, she attempted suicide and spent a week in the Spring Valley Memorial Hospital. While S.M. was in the hospital, Mori continued to be her treating physician. He told S.M. she was a manic depressive and put her back on the anti-depressant drugs.

S.M. sued Mori for medical malpractice. In her amended complaint, S.M. alleged Mori's actions "were negligent therapeutic deception caused either for the satisfaction of [Mori's] prurient interests or scientific curiosity." In addition, S.M. alleged that Mori was negligent in the following respects:

(a) failure to make a proper diagnosis of her conditions;

(b) failure to treat S.M.'s conditions under circumstances where Mori knew or should have known that he did not possess the requisite degree of skill, care or knowledge to treat her condition;

(c) failure to refer S.M. to another physician or specialist under circumstances where Mori knew or should have known that he did not possess the requisite skill, care and knowledge to treat her condition; and

(d) failure to keep and maintain adequate medical records and reports.

S.M. also alleged loss of consortium, infliction of emotional distress and breach of contract.

In the trial court, S.M. presented affidavits from Dr. Jerome Potts, a licensed physician and a board certified family practitioner, and Gary Schoener, a licensed psychologist and Executive Director of the Walk-in Counseling Center in Minneapolis. Dr. Potts stated that in his opinion, the sexual conduct of Mori constituted malpractice. Dr. Potts did not address the other claimed instances of medical malpractice. Schoener, an expert in the area of physician sexual misconduct, stated in his affidavit that in his experience he has found that physicians frequently believe their sexual conduct constitutes proper medical care at the time as a result of the physician's self-deceptive rationalizations or misinformation.

*The St. Paul Fire Policy*

St. Paul Fire issued a professional liability insurance policy to Mori. The policy provided:

Your professional liability protection covers you for damages resulting from:

1. Your providing or withholding of professional services.

In addition, under the heading "How This Agreement Protects You," the policy stated:

This agreement provides protection against professional liability claims which might be brought against you in your practice as a physician or surgeon.

St. Paul Fire sought a determination that it was not obligated to defend or indemnify Mori for the claims brought against him. St. Paul Fire moved for summary judgment, and S.M. cross-moved for summary judgment. The trial court granted St. Paul Fire's motion and denied S.M.'s motion. S.M., N.N. and A.N. have appealed. St.

Paul Fire moves to strike portions of S.M.'s appendix, asserting they were not before the trial court and are not properly before this court. St. Paul Fire also requests attorney fees pursuant to Minn.Stat. § 549.21 (1990).

## ISSUES

1. Did the trial court err in determining the St. Paul Fire policy does not provide coverage for Mori's actions?

2. Should portions of S.M.'s appendix be stricken and St. Paul Fire awarded bad-faith attorney fees?

## ANALYSIS

The standards for granting and reviewing summary judgment are well established. Summary judgment is appropriate when there is no genuine issue as to any material fact and a party is entitled to a judgment as a matter of law. Minn. R.Civ.P. 56.03. All facts and all reasonable inferences drawn from those facts are to be resolved in favor of the nonmoving party. *Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn.1981). Where an insurer asserts a claim is not within the coverage of a policy, the burden is on the insurer to establish that all parts of the cause of action against the insured are clearly outside of the scope of the policy's coverage. *Farmers & Merchants State Bank of Pierz v. St. Paul Fire & Marine Ins. Co.,* 309 Minn. 14, 18, 242 N.W.2d 840, 843 (1976).

On review of a summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). Interpretation of an insurance policy is a question of law which the trial court may properly decide on a motion for summary judgment and which this court reviews de novo on appeal. *See Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 886–87 (Minn.1978).

### 1. *The St. Paul Fire Policy*

■ Insurance policies are similar to other contracts. They are matters of agreement between the parties, and a court's function is to determine what the parties' agreement was and to enforce it. *See Fillmore v. Iowa Nat'l Mut. Ins. Co.,* 344 N.W.2d 875, 877 (Minn.App.1984). The extent of an insurer's liability is governed by the parties' contract. *Bobich v. Oja,* 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). In construing an insurance contract, the policy must be considered as a whole. *Henning Nelson Constr. Co. v. Firemen's Fund Am. Life Ins. Co.,* 383 N.W.2d 645, 652 (Minn.1986).

■ In interpreting an insurance policy, the court must give the words the parties have used their ordinary and usual meaning in order to give effect to the parties' intention as it appears from the language used. *Dairyland Ins. Co. v. Implement Dealers Ins. Co.,* 294 Minn. 236, 244–45, 199 N.W.2d 806, 811 (1972).

■ The duty to defend under an insurance policy arises when any part of the claim is arguably within the scope of the policy's coverage. *Jostens, Inc. v. Mission Ins. Co.,* 387 N.W.2d 161, 165 (Minn.1986).

■ Ordinarily, an insurer will assume only those risks that are beyond the effective control of its insured. In discussing "elementary insurance principles," the Minnesota Supreme Court has stated:

> In exchange for the payment of a premium, an insurer assumes certain risks that otherwise would be the obligation of the insured. In order to have predictable and affordable insurance rates, the insurers' assumptions of risk are usually limited to those beyond the "effective control" of the insured.

*Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co.,* 396 N.W.2d 229, 233–34 (Minn.1986) (discussing commercial general liability policies).

■ The St. Paul Fire policy provides coverage for liability arising out of Mori's providing or withholding of professional services.

A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized

knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

*Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 14, 157 N.W.2d 870, 872 (1968), *cited in Ministers Life v. St. Paul Fire & Marine Ins. Co.*, 483 N.W.2d 88 (Minn.App.1992), and *Western World Ins. Co. v. Anothen, Inc.*, 391 N.W.2d 70, 73 (Minn.App.1986).

> In a professional liability policy issued to a medical doctor, the term "professional services" plainly refers to medical treatment of physical ailments by the doctor. "[D]amages resulting from * * * providing * * * of professional services" contemplates improper or incorrect medical treatment of a physical ailment by the insured doctor. "[D]amages resulting from * * * withholding of professional services" contemplates failure on the part of the insured doctor to discover or treat an ailment that should have been discovered or treated.

*Smith v. St. Paul Fire & Marine Ins. Co.*, 353 N.W.2d 130, 132 (Minn.1984).

In *Smith*, the court, applying the language at issue in this case, held there was no coverage for claims against a medical doctor who took sexual liberties with three young boys whom he was treating for assorted medical problems. *Id.* However, not all sexual conduct between a doctor and a patient will come within the holding of *Smith*. The Minnesota Supreme Court has held that sexual conduct between a therapist and a patient, arising from the transference phenomenon, may be viewed as a failure to provide proper treatment of the transference phenomenon. *St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 702 (Minn.1990). The transference phenomenon is the

> process whereby the patient displaces onto the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly.

*Love*, 459 N.W.2d at 700 (quoting S. Waldron–Skinner, *A Dictionary of Psychotherapy* 364 (1986)).

The medical and legal communities uniformly agree that a

> psychiatrist's *mishandling the transference phenomenon* during treatment and taking sexual advantage of his patient *is malpractice* or gross negligence.

*Love*, 459 N.W.2d at 700 (quoting Louisell & Williams, 2 *Medical Malpractice* ¶ 17A.27 at 85–86 (1989)) (emphasis added). Mishandling of the transference phenomenon is deemed actionable because

> the professional services provided by a therapist require him to enter into a therapeutic alliance with the patient that invariably induces love-transference. Transference, of course, occurs at times in other relationships including that of medical doctor and patient, but the therapist alone *elicits* transference as a regular, accepted part of his practice in treating marital and sexual disorders. * * * The therapist must encourage the patient to express her transferred feelings, while rejecting her erotic advances; at the same time, he must explain to the patient that her feelings are not really for him, but that she is using him in a symbolic role to react to some other significant person in her life. In short, the therapist must both encourage transference and discourage certain aspects of it. This may be difficult to do and presents an occupational risk.

*Love*, 459 N.W.2d at 701 (citation omitted) (emphasis added). The court concluded:

> When sexual conduct occurs in this setting, it seems to us best understood as inextricably related to the dynamics of the therapeutic relationship. The sexual conduct, to be sure, is aberrant and unacceptable, but it is so related to the treatment contemplated that it comes within the scope of the insurance coverage for professional services provided or withheld.

> We suppose a therapist might take sexual advantage of a patient without transference being present. In such a case, much like the medical doctor in

*Smith,* the sexual conduct might well lie outside professional services.

*Id.* at 702.

According to *Love,* mishandling of the transference phenomenon is what is usually thought of by the term "malpractice." The St. Paul Fire policy is clearly intended to cover liability arising out of acts of malpractice. Herein lies the difficulty for N.N. and A.N. In order to be covered under the St. Paul Fire policy, it must be established that Mori's actions constituted medical malpractice. However, the claim of N.N. and A.N. for malpractice was dismissed on statute of limitations grounds, and this dismissal has not been challenged.

N.N. argues that since being advised by Mori that her ulcers were caused by sexual frustration and told her that the sexual abuse was a necessary part of medical treatment, Mori's sexual contact constituted improper or incorrect medical treatment of a physical ailment by Mori. This, however, is simply another way of saying that Mori committed malpractice. As noted earlier, the malpractice claim has been dismissed on statute of limitations grounds.

In the trial court, S.M. submitted an affidavit of Gary Schoener, who provided expert testimony regarding the transference phenomenon in *Love.* In Schoener's opinion, "some transference was present" in the relationship between S.M. and Mori. However, there was no evidence presented that Mori intended to enter into a therapeutic alliance with S.M. that was calculated to induce love-transference. S.M. presented no evidence that Mori mishandled an attempt to induce transference. Under *Love,* the presence of some transference is insufficient to constitute providing or withholding of professional services. There must be a conscious decision by the therapist to attempt to induce transference before the mishandling of the transference phenomenon will come within the holding of *Love.*

2. *Motion to Strike*

St. Paul Fire has moved to strike portions of S.M.'s appendix, alleging they were not before the trial court. S.M. has not responded to the motion to strike. The items complained of are not in the trial court file, and they must be stricken. An appellate court cannot base its decision on matters outside the record on appeal. *Holtberg v. Bommersbach,* 235 Minn. 553, 554, 51 N.W.2d 586, 587 (1952); *Brandenberg v. Auto–Owners Ins. Co.,* 352 N.W.2d 97, 100 (Minn.App.1984). St. Paul Fire seeks bad-faith attorney fees pursuant to Minn.Stat. § 549.21, subd. 2. We decline to award fees.

DECISION

Mori's conduct did not constitute providing or failing to provide professional services within the meaning of the St. Paul Fire policy. The trial court properly granted summary judgment.

Affirmed.