**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 22 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

    Plaintiff-Appellee,

    v.

STEPHEN B. GOLD, Ph.D.,

    Defendant,

    and

RHONDA WOOD,

    Defendant-Intervenor-Appellant.

No. 97-6076
(W. D. Oklahoma)
(D.C. No. CIV-95-1772)

**ORDER AND JUDGMENT**[*]

Before **BRORBY, BARRETT,** and **LUCERO** Circuit Judges.

Rhonda Wood (Wood), Intervenor-Defendant, appeals the district court's grant of summary

judgment in favor of St. Paul Fire and Marine Insurance Company (St. Paul) on its declaratory

judgment action against its insured, Dr. Stephen B. Gold (Dr. Gold).

Facts

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

In April, 1994, Wood and her husband consulted Dr. Gold for marriage counseling. Based on his initial assessment of Wood and her husband, Dr. Gold initiated separate counseling sessions. Wood testified that shortly after she began seeing Dr. Gold in May or June, 1994: she began having "positive feelings" toward Dr. Gold, (Appellant's Appendix at 113); she disclosed these feelings to him in a session in June, 1994, id. at 115, and in the next therapy session, Dr. Gold admitted that he was also attracted to her, which Wood stated made her feel "like a million bucks," id. at 121; in July, 1994, Dr. Gold told her he had never had feeling for another client as strongly as he did for her, id. at 123; in August, 1994, her depression increased and she started seeing Dr. Gold more frequently, id. at 124 & 197; and Dr. Gold expressed concerns that seeing him more frequently, more than once a week, would only make her feelings for him increase, but ultimately agreed. Id. at 126.

Wood further testified that: in October, 1994 she was aware of feeling like she was falling in love with Dr. Gold, id. at 128, 200, & 228; between November, 1994, and January, 1995, her conversations with Dr. Gold became increasingly more romantic and sexual in nature; in February, 1995, Dr. Gold informed her that he had fallen in love with her, she was his "Mother Earth," and she may be his "Immortal Beloved," id. at 142-43; see id. at 232, 239, 243, & 252; and following these disclosures, she asked her husband to move out of the family home because she did not want to reconcile their marriage, id. at 145.

In mid-March, 1995, the relationship between Dr. Gold and Wood became physical. At the end of one session, Dr. Gold followed her to the door where Wood hugged him and Dr. Gold stated that it was "just a practice hug." Id. at 150. Wood testified that then they began kissing and that Dr. Gold was breathing hard and rubbing his hand down her thigh while grabbing at her around the waist with thrusting motions. Id. at 150-51. See id. at 249. Dr. Gold then wrapped his arms around

Wood's waist from behind and "shoved his erection into [her] backside." Id. at 153. See id. at 249.

In April, 1995, Dr. Gold told Wood that he had decided to leave his marriage and that he wanted to marry her. Id. at 171-72. See id. at 250.

On April 30, 1995, Wood and Dr. Gold went on an excursion to the Wichita Mountains near Lawton, Oklahoma. Id. at 178. They hiked to a fairly secluded clearing where they talked and laid down on Wood's blanket together. Id. at 184. They started talking about their fantasies about each other and started "making out . . . like a couple of sixteen-year-olds" kissing, hugging and fondling each other Id. at 72-73, 246. Wood testified that Dr. Gold told her he fantasized about making love to her. Id. at 72. At some point, Wood took off her shirt and bra and unzipped her shorts, after which she fondled Dr. Gold's genitals and placed her mouth on his penis. Id. at 73-74. Dr. Gold then ejaculated, but they did not engage in sexual intercourse. Id. at 74.

On May 6, 1995, Wood was admitted to Bethany Pavilion for treatment as an inpatient for depression, anxiety and suicidal tendencies. See id. at 287 ¶4. On May 9, 1995, Dr. Gold sent Wood a letter terminating his therapeutic relationship with her. Id. at 77. At the same time, Dr. Gold also terminated his therapeutic relationship with Wood's husband. Id. at 76.

In August, 1995, Wood filed a civil action against Dr. Gold in Oklahoma state district court. In her complaint, Wood alleged that Dr. Gold carelessly and negligently failed to use the proper standard of care in his therapy and counseling of her, including: failure to properly handle the transference and counter-transference issues;[1] failure to refer her to another licenced therapist upon

---

[1] "Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is 'generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past.. . .'" Bladen v. First Presbyterian Church of Sallisaw, 857 P.2d 789, 794 (Okla. 1993)

(continued...)

- 3 -

knowledge of a conflict of interest; negligently counseling and failure to counsel and treat her emotional and mental condition; and abandoning her at the termination of the therapist-patient relationship in light of her severe emotional condition. Id. at 306-07 ¶12. In addition, Wood claimed that Dr. Gold breached an implied contract to provide appropriate treatment and counseling in return for compensation and that Dr. Gold's actions were unfair and deceptive trade practices in violation of the Oklahoma Consumer Protection Act, 15 Okla. Stat. § 751 et seq. Id. at 308-09 ¶22, 26.

In November, 1995, St. Paul initiated this action for a declaratory judgment against its insured, Dr. Gold, requesting a declaration that it had no duty to defend or indemnify Dr. Gold with respect to Wood's state court action. Id. at 5. St. Paul admitted Dr. Gold had a medical professional liability insurance policy as a psychologist for the period in question in Wood's action. Id. at 2 ¶5. However, St. Paul pointed out that Dr. Gold's policy contained a Sexual Contact or Activity Exclusion Endorsement, which it argued precluded coverage for all damages sought by claimants, such as Wood, regarding sexual activity. Id. at 3-4 ¶9. See also id. at 44. St. Paul characterized Wood's claims as "resulting on account of [Dr.] Gold's alleged inappropriate handling of the transference dynamic resulting in a sexually charged, romantic relationship including sexual contact or activity . . .." Id. at 4-5 ¶10. St. Paul then asserted that Dr. Gold admitted mishandling of the transference dynamic and engaging in sexual contact or activity with Wood. Id. at 5 ¶11-13. Thus,

---

[1](...continued)
(quoting Simmons v. United States, 805 F.2d 1363, 1364 (9th Cir. 1986)). Both hostile and loving emotions directed toward the therapist are recognized as constituting the transference phenomenon. Simmons, 805 F.2d at 1365. Countertransference, on the other hand, is the proper therapeutic response, which avoids emotional involvement and assists the patient in overcoming problems. Id. If countertransference is mishandled, the therapist transfers his or her own problems to the patient. St. Paul Fire & Marine Ins. Co. v. Love, 459 N.W.2d 698, 700 (Minn. 1990).

St. Paul claimed a reasonable basis upon which to deny coverage and defense of Dr. Gold in Wood's action. Id. at 6-7 ¶18(c).

On October 30, 1996, St. Paul filed a motion for summary judgment. Id. at 12. St. Paul argued that the language of the exclusion unambiguously excluded all claims alleged by Wood in her state court action. Id. at 20. St. Paul submitted that all of Wood's claims result from Dr. Gold's mishandling of the transference phenomenon and the resultant sexual relationship, i.e., that "but for" the inappropriate sexual relationship, Wood has no claim against Dr. Gold for malpractice. Id. at 24.

On December 20, 1996, the district court granted St. Paul's motion for summary judgment, holding that under the policy, St. Paul had no duty to insure or defend Dr. Gold for professional liability losses sustained as a result of any claim asserted in Wood's state court malpractice suit. Id. at 333. The district court determined that Wood's claims were all grounded upon Dr. Gold's admitted mishandling of the love-transference phenomenon in his therapeutic relationship with Wood and the romantic and sexual contact between them, as fully described in the parties depositions, which ultimately resulted in the abrupt and inappropriate termination of their therapeutic relationship. Id. at 336. The district court concluded that three provisions of the exclusion established that St. Paul had no duty to defend or indemnify Dr. Gold for any losses as a result of Wood's malpractice claims. First, the district court determined that the under their common usage the terms "sexual contact" and "sexual activity" included both overt physical encounters of a sexual nature, such as, fondling, kissing, hugging, and fellatio, and verbal expressions of sexuality and/or sexual or romantic interest. Id. at 340. Second, the court concluded that the exclusion applied to those professional liability injuries that result from the neglect of the therapeutic needs of a patient

due to the engagement in sexual contact or activity. Id. at 341. Third, the court noted that the exclusion specifically provided no coverage for professional liability where the mishandling of the transference phenomenon results in sexual contact or activity. Id. 341-42. The district court then stated that "[s]ince both [Dr.] Gold and Wood ultimately attribute all [Dr.] Gold's professional negligence to a mis-handling of the love transference phenomenon, [it] must hold the Exclusion prevents [St. Paul] from being required to insure [Dr.] Gold for any professional liability injuries asserted in Wood's Malpractice Case." Id. at 342. In addition, the court determined that it was not against public policy for the exclusion to be construed in a manner that excludes Wood's claims from being within the scope of the policy. Id.

Appeal

On appeal, Wood contends that the district court erred in granting summary judgment to St. Paul. Wood asserts that the district court erred in: (1) determining the exclusion was unambiguous; (2) construing the terms "sexual contact or activity" in a constrained, unusual, and uncommon manner by including in the interpretation romantic activities or discussions; (3) determining that the mishandling of the transference phenomenon, which occurred prior to any sexual contact or activity, was excluded because sexual contract or activity ultimately occurred; (4) concluding that all Dr. Gold's acts of professional malfeasance were inextricably intertwined with the sexual activity; (5) making findings of fact and drawing inferences that were not in the light most favorable to her as the non-moving party; and (6) concluding that application of the exclusion to exclude all of her claims did not violate public policy.

We review the district court's grant of summary judgment *de novo*, applying the same legal standard as the district court pursuant to Fed. R. Civ. P. 56(c). Kaul v. Stephan, 83 F.3d 1208, 1212

- 6 -

(10th Cir. 1996) (quoting Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995)). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. We examine the factual record and all reasonable inferences therefrom in the light most favorable to the non-moving party. Id. If no genuine issue of material fact is in dispute, we determine if the substantive law was correctly applied. Id.

In this case, subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). A federal court sitting in diversity applies the substantive law of the forum state. Farmers Alliance Mut. Ins. Co. v. Salazar, 77 F.3d 1291, 1294 (10th Cir. 1996) (applying Oklahoma law). Therefore, we apply the substantive law of Oklahoma. We must apply the most recent statements of Oklahoma law by the Oklahoma Supreme Court and if no case law exists on point, we turn to other state court decisions, federal decisions, and the general weight and trend of authority. Id.

### Discussion

We consider Wood's first three contentions together as they each involve the interpretation of "sexual contact or activity" in the exclusion. First, Wood contends that the district court erred in concluding that the sexual contact or activity exclusion was unambiguous because the exclusion is reasonably susceptible to more than one interpretation and because paragraph five of the exclusion creates ambiguity. Wood asserts that the terms "sexual contact or activity" are susceptible to multiple meanings and that a person of ordinary intelligence would understand the terms to require some physical component, in contrast to the district court's determination. Wood argues that the

- 7 -

district court erroneously read the language of paragraph five of the exclusion as a separate exclusion precluding certain liability, rather than as an explanation that injuries that are a consequence of sexual misconduct or activity are excluded even if that contact or activity resulted from the mishandling of transference.

Second, Wood asserts that the district court construed the terms "sexual contact or activity" in a constrained, unusual, and uncommon manner by including in the definition romantic activity or discussions, such as expressions of love, affection, admiration and benevolence. Wood urges that the plain and ordinary meaning of "sexual contact or activity" must encompass some physical element, such as touching, motivated by thoughts of sex.

Third, Wood claims that the district court erred in determining that the mishandling of the transference phenomenon, which occurred prior to any sexual contact or activity, was excluded because sexual contract or activity ultimately occurred. Wood contends that the language of paragraph five of the exclusion does not expand the exclusion to apply to all injuries resulting from the mishandling of transference, but simply explains that injuries that are a consequence of sexual contact or activity are excluded even if that contact or activity resulted from the mishandling of transference.

Our research indicates that neither Oklahoma courts nor other state courts have construed the exact policy language at issue here. Therefore, we are guided by Oklahoma's general law of interpreting insurance contracts. Under Oklahoma law, the interpretation of an insurance contract and whether it is ambiguous is determined by the court as a matter of law. Max True Plastering Co. v. United States Fidelity & Guar. Co., 912 P.2d 861, 869 (Okla. 1996); Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991). In interpreting an insurance contract, the terms of the contract, if

unambiguous, are construed in their plain and ordinary sense. Littlefield v. State Farm Fire & Cas. Co., 857 P.2d 65, 69 (Okla. 1993). The court "will not make a better contract by altering a term for a party's benefit." Max True Plastering Co., 912 P.2d at 869. The court will "not indulge in forced or constrained interpretations to create and then to construe ambiguities," id, "nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as to import a [more] favorable consideration to either party than that expressed in the contract." State ex rel. Crawford v. Indemnity Underwriters Ins. Co., 943 P.2d 1099, 1101 (Okla. Ct. App. 1997). However, "'[i]f the insurance policy language is doubtful and susceptible to two constructions, without resort to and following application of the rules of construction, then a *genuine ambiguity* exists, and the contract will be interpreted, consistent with the parties' intentions, most favorably to the insured and against the insurance carrier.'" American Cas. Co. of Reading, Penn. v. F.D.I.C., 958 F.2d 324, 326 (10th Cir. 1992) (quoting Dodson, 812 P.2d at 376-77 (footnotes omitted)).

The Sexual Contact or Activity Exclusion Endorsement provides:

**Sexual contact or activity.** We won't cover professional liability injury that results from any kind of sexual contact or activity by the individual protected person.

* * *

We'll apply this exclusion whether or not:
•the sexual contact or activity was accidental, intentional, or negligent;
•the protected person believed that a client, patient or other person consented to the sexual contact or activity;
•the protected person neglected the therapeutic needs of a client, patient or other person because of the sexual contact or activity; or
•any mishandling of transference or any other psychotherapeutic dynamic resulted in the sexual contact or activity.

(Appellant's Appendix at 44).

Our reading of the exclusion, in its plain and ordinary sense, leads us to conclude that the

district court did not err in determining the exclusion was not ambiguous. The terms "sexual contact or activity" are not susceptible to two interpretations. "Sexual" means "of, relating to, or associated with sex or the sexes." Webster's New Collegiate Dictionary 1063 (1977). Thus, considering the plain and ordinary usage of the terms, "sexual contact" includes all physical acts of, relating to, or associated with sex and "sexual activity" involves something other than the physical element of, relating to, or associated with sex. To limit "sexual contact or activity" to only physical acts of a sexual nature, as Wood would have us do, renders the "sexual activity" component of the exclusion a nullity, as "sexual contact" and "sexual activity" would then have the same meaning. See Dodson, 812 P.2d at 376 ("An insurance policy . . . is liberally construed, . . . so as to give a reasonable effect to all of its provisions, if possible."); Franks v. Bridgeman, 63 P.2d 984, 987-88 (Okla. 1936) (courts should avoid interpreting contract clause in a manner that would render it to no effect). The exclusion is expressed in plain, certain and readily understandable language and must, therefore, be enforced as written. See Church Mut. Ins. Co. v. Klein, 940 P.2d 1001,1003 (Co. Ct. App. 1996). Wood cannot create an ambiguity simply by disagreeing with the court's interpretation. Based on the language of the exclusion, we hold that sexual contact or activity includes both overt physical encounters of a sexual nature and verbal expressions of sexuality and/or sexual interest.

Wood's assertion that paragraph five of the exclusion, the second paragraph quoted above, creates an ambiguity in itself is without merit. By its own terms, this paragraph directs that the exclusion will be applied regardless of the occurrence of four enumerated events. If, as in Wood's case, the mishandling of the transference dynamic results in sexual contact or activity, the exclusion applies to preclude coverage for any professional liability resulting therefrom. Thus, the district court did not err in concluding that losses sustained as a result of the mishandling of the transference

dynamic are excluded where the result of the mishandling is sexual contact or activity. See id. at 342.

Fourth, we agree with the district court that the exclusion applies to the remainder of Wood's claims because Dr. Gold's other alleged acts of professional malfeasance were inextricably intertwined with the sexual activity. See American Home Assurance Co. v. Stone, 61 F.3d 1321, 1329-30 (7th Cir. 1995); Govar v. Chicago Ins. Co., 879 F.2d 1581, 1583 (8th Cir. 1989) (even though malpractice judgment did not expressly state sex as the essential element of patient's cause of action against psychologist, sexual relationship between psychologist and patient was so intertwined with malpractice as to be inseparable).

Wood argues that she presented evidence that Dr. Gold committed acts of malpractice separate and distinct from the sexual misconduct through the affidavits of Dr. Ana Maria Gutierrez, Wood's treating psychiatrist, and Dr. Keith Green, Wood's expert psychologist, and that she suffered injuries resulting from these nonsexual acts of malpractice. We disagree. In her complaint, Wood alleged that Dr. Gold carelessly and negligently failed to use the proper standard of care in his therapy and counseling of her, including: failure to properly handle the transference and counter-transference issues; failure to refer her to another licenced therapist upon knowledge of a conflict of interest; negligently counseling and failure to counsel and treat her emotional and mental condition; and abandoning her at the termination of the therapist-patient relationship in light of her severe emotional condition. Id. at 306-07 ¶12. Taken as a whole, Wood's deposition, Dr. Gold's deposition, and the affidavits of Drs. Gutierrez and Green demonstrate that the sexual contact or activity between Dr. Gold and Wood was the basis of and inextricably intertwined with their sexual activities. See e.g. Govar, 879 F.2d at 1583. Additionally, Wood's claims stem from Dr. Gold's

mistreatment or neglect of her therapeutic needs, including the mishandling of the transference dynamic, and, as such, are expressly excluded from coverage as two of the enumerated situations where the exclusion specifically applies. See Appellant's Appendix at 44 ¶5 (exclusion applies whether or not "the protected person neglected the therapeutic needs of a client, patient, or other person because of the sexual contact or activity" or "any mishandling of transference . . . resulted in the sexual contact or activity"). Finally, the affidavits of Drs. Gutierrez and Green do not support Wood's position. Although both doctors affirm that, in their professional opinions, Dr. Gold committed malpractice and Wood suffered injuries therefrom before any sexual misconduct, a close reading of their affidavits and the factual support thereof refutes their positions. The affiants simply reiterate that Dr. Gold failed to properly diagnose and treat Wood's condition and mishandled the transference phenomenon. Id. at 264-67, 288-89. Therefore, the district court did not err in concluding that Dr. Gold's acts of professional malfeasance alleged by Wood in her state malpractice action, that Dr. Gold did not meet her therapeutic needs and mishandled the transference dynamic, were inextricably intertwined with their sexual contact or activity.

Fifth, Wood contends that in granting summary judgment in favor of St. Paul, the district court erred in making findings of fact and drawing inferences not in the light most favorable to her, the non-moving party. Wood claims that the district court could only reach its conclusion that the facts were undisputed by completely ignoring the affidavits of Drs. Gutierrez and Green and that the court's finding that all of the acts of malpractice were inextricably intertwined with the sexual misconduct invades the province of the jury by making factual determinations as to the causes of her injuries and ignores her uncontroverted evidence. Wood's contentions are without merit. As noted above, Wood's reliance of the affidavits is misplaced and the district court did not err in determining

that Dr. Gold's acts of malfeasance were inextricably intertwined with the sexual contact or activity.

Sixth, Wood maintains that the district court's interpretation of the exclusion violates public policy because it excludes from coverage injuries caused by malpractice that are completely unrelated to the sexual misconduct or that occurred prior to the sexual misconduct. Wood claims that the court's construction of the exclusion is so broad that if any sexual misconduct ultimately occurs all negligent conduct by Dr. Gold is excluded from coverage, including prior nonsexual misconduct. Wood reasons that such an expansive reading discourages clients from taking advantage of statutes aimed at stopping therapist misconduct so that other clients will be protected from unethical, unprofessional, and harmful conduct. We disagree.

Wood mischaracterizes the breadth of the exclusion. While the exclusion's umbrella is broad enough to cover this rainstorm, it does not cover nonsexual malpractice. As we held above, Wood's claims are all inextricably intertwined with the sexual contact or activity between she and Dr. Gold. Thus, there are no nonsexual malpractice claims to be considered. Cf. American Home Assurance Co. v. Cohen, 881 P.2d 1001, 1009 (Wash. 1994) (en banc) ("[I]t is against the public policy [of Washington] for an insurer to provide lesser coverage for a psychologist's nonsexual misconduct, where sexual misconduct is also alleged . . ., than the coverage that is provided where only nonsexual misconduct is claimed.").

There is no doubt that, like all states, Oklahoma has a policy of protecting patients from sexual exploitation by their therapists. See 59 Okla. Stat. § 1370 (psychologist's license may be suspended or revoked for "[e]ngaging in sexual intercourse or other sexual contact with a client or patient"). It is equally apparent that therapists who engage in a sexual relationship with their patients are guilty of malpractice. See Bladen v. First Presbyterian Church of Sallisaw, 857 P.2d 789, 793

(Okla. 1993) ("When the therapist mishandles transference and becomes sexually involved with a patient, medical authorities [and courts] are nearly unanimous in considering such conduct to be malpractice."). However, simply because Oklahoma has an interest in protecting the public from, and possibly compensating the victims of, sexual exploitation, it does not necessarily follow that such a public policy would serve to preclude insurers from limiting their liability coverage arising out of the insured's sexual misconduct. The exclusion can be considered a legitimate effort by St. Paul to offer an insurance policy and at the same time limit its exposure to a substantial hazard or risk of loss, especially in light of the potentially large jury verdicts that often result from suits involving emotionally charged subjects, such as sexual misconduct by therapists. See American Home Assurance Co. v. Stone, 61 F.3d 1321 (7th Cir. 1995) (sexual misconduct provision limiting liability coverage did not violate Illinois public policy); Cohen, 881 P.2d at 1005 ("[I]t is not against public policy [of Washington] for an insurer to provide lesser coverage for a psychologist's sexual misconduct than it provides for the psychologist's nonsexual misconduct."); St. Paul Fire & Marine Ins. Co. v. Love, 459 N.W.2d 698, 702 (Minn. 1990) ("If the [insurer] does not want to provide coverage for this particular peril, it would seem it might exclude any claim for damages based on professional services in the treatment of transference which results in a sexual relationship between the insured and the patient.").

     **AFFIRMED.**

              Entered for the Court:

              James E. Barrett
              Senior United States
              Circuit Judge