RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JASON LAIBLE, Executor of the estates of Raymond Laible and Gayle Laible; STEVEN KLEIN; MARIBETH KLEIN,

        *Plaintiffs-Appellees*,

      *v.*

TIMOTHY LANTER; BRETT THOMAS; DONALD SCALF,

        *Defendants-Appellants*,

UNITED STATES OF AMERICA,

        *Defendant-Appellee*.

No. 22-5496

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:21-cv-00102—David L. Bunning, District Judge.

Argued: March 8, 2023

Decided and Filed: January 23, 2024

Before: COLE, GIBBONS, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Aaron M. Herzig, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Catherine Padhi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. **ON BRIEF:** Aaron M. Herzig, Spencer S. Cowan, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Catherine Padhi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. Jacqueline Greene, Alphonse Gerhardstein, M. Caroline Hyatt, Rebecca Salley, FRIEDMAN GILBERT + GERHARDSTEIN, Cincinnati, Ohio for Appellee Laible. J. Stephen Smith, Roula Allouch, GRAYDON HEAD & RITCHEY LLP, Ft. Mitchell, Kentucky, for the Klein Appellees.

     COLE, J., delivered the opinion of the court in which GIBBONS, J., joined. READLER, J. (pp. 12–21), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

COLE, Circuit Judge.  In August 2020, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and the Cincinnati Police Department (CPD) participated in a joint federal task force to arrest Mason Meyer.  While fleeing from CPD officers, Meyer lost control of his vehicle and crashed into a restaurant, killing Gayle and Raymond Laible and severely injuring Steven and Maribeth Klein.  The Laibles' estate and the Kleins brought this lawsuit alleging that three CPD officers were negligent in their execution of the high-speed car chase.

The CPD defendants in this action—Sergeant Donald Scalf, Sergeant Timothy Lanter, and Officer Brett Thomas—allege that they were federal employees immune from common-law tort actions due to their participation in the federal task force to arrest Meyer.  The district court denied the officers' motion for immunity under the Westfall Act, 28 U.S.C. §§ 2679(b)(1), (d)(1), (d)(3).  We reverse the district court's denial of immunity for Scalf because he was a federal employee acting within the scope of his employment during the chase.  We affirm the district court's denial of immunity as to Lanter and Thomas because neither were federal employees at the time of the incident.

I.

On August 7, 2020, a federal task force led by the ATF, with the assistance of CPD and the Northern Kentucky Drug Strike Force (NKDSF), executed state warrants to apprehend Mason Meyer in connection with a drug and gun trafficking investigation in Cincinnati, Ohio. Donald Scalf, a CPD sergeant, had been deputized to the ATF since August 2015.  Scalf was assigned to surveil Meyer under the ATF's operational plan for the arrest.  On the day of the incident, Meyer left his home driving a vehicle containing two other people and a suspected illegal weapon.  CPD was to "conduct a felony traffic stop," which contemplated pursuit, per its standard operating procedures should Meyer escape an attempted traffic stop.  ATF Operational

Plan, R. 58-1, PageID 445. CPD Sergeant Timothy Lanter attempted a traffic stop, but Meyer sped off.

Lanter pursued and requested CPD Officer Brett Thomas's assistance. Thomas responded in a separate vehicle. Scalf supervised the pursuit via radio as a deputized ATF agent and declared himself the Officer-in-Charge (OIC) pursuant to CPD policy. The ATF Resident in Charge (RAC), Frank Occhipinti, assisted Scalf by using cell phone tracking data to confirm that Meyer was in the vehicle. Shortly thereafter, radio communication shifted from a CPD/ATF joint radio channel to a CPD-only channel.

The officers chased Meyer through parts of Cincinnati, with all three vehicles reaching speeds over 100 miles per hour. Scalf authorized Lanter's and Thomas's continued pursuit of Meyer across the bridge into Covington, Kentucky. Meyer and the CPD vehicles crossed into oncoming lanes of traffic on the bridge and continued the chase through downtown Covington. At one point, Lanter authorized Thomas to drive the wrong way down a one-way street without obtaining clearance from Scalf.

The chase proceeded across another bridge into Newport, Kentucky. Meyer eventually ran a red light, lost control of the vehicle, and crashed into the sidewalk patio of the restaurant where Raymond and Gayle Laible were dining. The Laibles were directly hit by the vehicle, and Steven and Maribeth Klein, who were walking by, were struck by debris and thrown several yards onto the asphalt. Gayle died on the scene and Raymond was taken to the hospital where he was later pronounced dead. The Kleins experienced multiple, severe injuries. Meyer was taken into custody and charged with two counts of murder, and two counts of endangerment and fleeing from the police.

The executor of the Laibles' estate and the Kleins filed this lawsuit in August 2021 in Campbell County Circuit Court. The lawsuit alleges personal injury, negligence, wrongful death, and negligent supervision claims against Scalf, Lanter, Thomas, Meyer, and the City of Cincinnati. The officers and City removed the case to federal court. The officers sought certification of Westfall Act immunity from the United States, which limits liability against federal officers for common-law tort actions committed while acting within the scope of their

employment, but the United States declined.  The officers then filed a petition for the district court to review the denial of certification.  The district court denied the petition, concluding that Scalf was not acting within the scope of his employment as an officer detailed to the ATF and that Lanter and Thomas were not federal officers for purposes of the statute.  The officers appealed the district court's decision.

## II.

## A.

In 1946, Congress passed the Federal Tort Claims Act (FTCA), "'which waived the sovereign immunity of the United States for certain torts committed by federal employees' acting within the scope of their employment." *Brownback v. King*, 141 S.Ct. 740, 746 (2021) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475–76 (1994)).  In 1988, however, Congress passed the Federal Employees Liability Reform and Tort Compensation Act (Westfall Act).  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 425–26 (1995).  The act immunizes federal employees from individual common-law tort claims that arise while the employee was acting within the scope of their employment and substitutes the United States as the party defendant.  28 U.S.C. §§ 2679(b)(1), (d)(1).

The act empowers the Attorney General to certify that an employee was acting within the scope of federal employment at the time the harm occurred.  *Id.* at (d)(1).  If the Attorney General declines to certify, "the employee may at any time before trial petition [a federal district] court to find and certify that the employee was acting within the scope of his office or employment." *Id.* at (d)(3).  Then, the district court must determine whether: (1) the employee qualifies as a federal employee; and if so, (2) whether the challenged conduct fell within the scope of federal employment.  *Id.* at (b)(1).

We review a district court's decision regarding Westfall Act immunity de novo.  *Sullivan v. Shrimp*, 324 F.3d 397, 399 (6th Cir. 2003).  While Westfall Act certification is a legal question, a district court must resolve disputed issues of fact necessary to its decision before certifying any federal employee for Westfall Act immunity.  *Singleton v. United States,* 277 F.3d 864, 870 (6th Cir. 2002) (overruled on other grounds).

We review findings of fact for clear error. Fed. R. Civ. P. 52(a)(6). In its denial of immunity, however, the district court stated that no disputed facts material to the Westfall Act question exist. Therefore, we review de novo the district court's legal conclusions as well as its application of the law to the facts on record. *Dolan v. United States*, 514 F.3d 587, 593 (6th Cir. 2008) (citing *Singleton*, 277 F.3d at 870).

## B.

Individuals are employees of the federal government under the FTCA if they are: (1) "officers or employees of any federal agency"; or (2) "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. These two definitions are commonly referred to as the federal employee clause and the official capacity clause, respectively. *See Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022).

First, the federal employee clause defines "federal agency" as including "'executive departments, the judicial and legislative branches,' and other governmental entities." *Does 1–10 v. Haaland*, 973 F.3d 591, 597 (6th Cir. 2020) (quoting 28 U.S.C. § 2671). An individual detailed to a federal agency is considered a federal employee for purposes of the FTCA. 5 U.S.C. § 3374(c)(2); *see also Robertson v. Lucas*, 753 F.3d 606, 613–14 n. 3 (6th Cir. 2014) (state and local law enforcement detailed to DEA task force were federal employees for purposes of the Westfall Act); *Petty v. United States*, 80 F. App'x 986, 989 (6th Cir. 2003) (local police officer who was assigned to an FBI-operated task force was a federal employee for purposes of the FTCA).

Scalf squarely meets the definition of federal employment as an officer deputized to the ATF at the time of the incident. Scalf "carried an ATF badge, wore an ATF uniform, attended ATF trainings, worked from an ATF field office, and received pay from the federal government." Mem. Op. & Order, R. 64, PageID 477.

The Laible estate and the Kleins argue, however, that Scalf could not have been a deputized ATF officer on August 7, 2020 because he served longer than the statutorily permitted length and there was no written memorialization of his deputized status. Specifically, the

applicable regulation requires that an employee deputized to a federal task force for four continuous years, must make "at least a 12-month return to duty with the organization from which the employee was originally assigned," and the federal agency and deputized employee must enter into a written agreement. *See* 5 C.F.R. §§ 334.104(c); *see also id.* at 106(a). According to the record, Scalf was deputized to the ATF from August 2015 through December 2020—more than five years—and no written agreement was submitted to the court.

Because the district court did not hold an evidentiary hearing, the plaintiffs argue that they were deprived of the opportunity to discover evidence on the validity of Scalf's status as a deputized ATF agent. The district court made no findings of fact as to this issue. The plaintiffs, however, essentially challenge the district court's interpretation of the record, warranting clear error review.

Where there is evidence in the record to support the district court's factual finding and the finding was a reasonable construction of the evidence, no clear error has occurred. *United States v. Sands*, 4 F.4th 417, 420 (6th Cir. 2021). Further, the decision to hold an evidentiary hearing is within the discretion of the district court. *Clark v. Warden*, 934 F.3d 483, 497 (6th Cir. 2019). Here, the district court determined that an evidentiary hearing was unnecessary and relied on affidavits from Scalf and Occhipinti affirming Scalf's status as a deputized ATF agent. Because the record supports that Scalf was a federal employee detailed to the ATF at the time of the incident, we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (quoting *United States v. Charles*, 138 F.3d 257, 262 (6th Cir. 1998)). Therefore, Scalf meets the definition of federal employee under the federal employee clause.

There is no dispute that Lanter and Thomas were employed by CPD, and do not meet the definition of federal employee under the federal employee clause. Therefore, they can only be considered federal employees if they meet the requirements of the official capacity clause.

Under the official capacity clause, Lanter and Thomas can meet the definition of a federal employee if they can prove that they "act[ed] on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without

compensation." 28 U.S.C. § 2671. This court has yet to provide guidance on the official capacity clause, and the Supreme Court has addressed the clause's language on only one occasion.

In *Logue v. United States*, the parents of a federal prisoner who hanged himself while in a county jail brought suit against the United States pursuant to the FTCA for the wrongful death of their son. 412 U.S. 521, 522 (1973). The plaintiffs argued that under the federal employee clause, the county jail was a federal agency, and under the official capacity clause, the jail employees were "acting on behalf" of the Federal Bureau of Prisons. *Id.* at 526. The Court established that the critical factor in differentiating between federal employees and contractors "is the authority of the principal to control the detailed physical performance of the contractor." *Id.* at 527–28. In other words, where the federal government exercises that level of control over an individual, the definition of federal employee is met. *See id.*

The Court concluded that the county jail was a contractor over which the federal government lacked any control, and contractors were explicitly exempted from immunity as non-federal agencies pursuant to the federal employee clause of 28 U.S.C. § 2671. *Id.* at 528–30. Turning to the official capacity clause, the Court acknowledged that the legislative history of the "acting on behalf of" language within the clause was sparse but appeared "to cover special situations such as the 'dollar-a-year' man who is in direct service of the Government without pay, or an employee of another employer who is placed under *direct supervision of a federal agency* pursuant to contract *or other arrangement*." *Id.* at 530–01 (emphasis added); *see also Talignani*, 26 F.4th at 386 (explaining that the official capacity clause was meant to extend immunity to volunteers, special law enforcement, confidential informants, and any other scenarios in which the individual was not a federal employee, nor federal contractor, but still acted on behalf of the federal government in an official capacity). That said, the Court ultimately ruled that the official capacity clause could not serve as an end-run around the ban on federal contractors, and therefore, the jail employees were also not federal employees pursuant to the official capacity clause. *Logue*, 412 U.S. at 531–32.

*Logue*'s "control" or "supervision" test was reinforced a few years later in *United States v. Orleans*. 425 U.S. 807 (1976). There, the Supreme Court concluded that a community action

agency subject to substantial federal regulation was not a "federal agency" and its employees were not federal employees because the federal government lacked the "power to supervise the[ir] daily operation." *Id.* at 817–19.

Although the Court articulated the *Logue* control test to distinguish contractors and federal employees, it still controls here because the Court did not limit the test's application to government use of independent contractors. Further, even if the test is classified as dicta, "[l]ower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *In re Baker*, 791 F.3d 677, 682 (6th Cir. 2015) (quoting *Am. Civ. Liberties Union of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 447–48 (6th Cir. 2010)). Lanter and Thomas have provided no such challenging authority.

The control test simply sets the threshold that an individual with some kind of arrangement with the federal government must meet to be considered a federal employee for purposes of the official capacity clause. Importantly, other circuits have applied the control test when determining whether a defendant is a federal employee for purposes of the official capacity clause. *See e.g., Sisto v. United States*, 8 F.4th 820, 830 (9th Cir. 2021) (acknowledging that "the Supreme Court applies the ordinary 'control test' to [the official-capacity clause] of § 2671," but concluding that a doctor working on a Native American reservation hospital was a contractor and not a federal employee); *U.S. Tobacco Coop. Inc. v. Big South Wholesale of Virginia, LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (finding that evidence existed to support that confidential informants were "sufficiently controlled by, and subject to the control of, the ATF . . . so as to be found to be federal employees acting in an official capacity on behalf of the United States"); *but see Talignani*, 26 F.4th at 384 n. 3 (explaining that *Logue* did not adopt an interpretation that applied the control test to the official capacity clause, but limited its application to the federal employee clause).

Under *Logue*'s control test, the district court correctly denied Westfall Act immunity for Lanter and Thomas. Under the operational plan, Lanter and Thomas were never under direct ATF supervision, so they were not "acting on behalf" of the ATF. *Logue* 412 U.S. at 531. Lanter assisted in the chase because it was CPD's responsibility, as part of the task force, to

effectuate a traffic stop when Meyer fled. *See Petty*, 80 F. App'x at 989 (concluding that Detroit police officers assisting an FBI-task force in effectuating a search warrant were not federal officers for purposes of the FTCA). The ATF did not suddenly gain control over Lanter's "detailed physical performance" during the car chase when Scalf declared himself OIC. *Logue*, 412 U.S. at 527–28. In fact, the ATF operational plan explicitly stated that any car chase would be initiated by CPD officers and conducted pursuant to CPD policy. *See* ATF Operational Plan, R. 58-1, PageID 445 ("Any vehicle pursuits will be initiated and monitored by CPD pursuit policy. ATF will not initiate any pursuits . . . . CPD uniform vehicles will be advised and directed to conduct a traffic stop following CPD policy, ATF will assist as needed."). Any involvement by Scalf or the ATF, once Lanter began pursuit, was for the purposes of assistance only—not to control, direct, or supervise the chase. The fact that Scalf authorized Lanter to cross into Kentucky does not diminish CPD's control over the rules governing the chase.

Thomas was an additional step removed from ATF supervision as he only received authorization to join the chase from Lanter. Thomas was at the CPD training facility, in CPD uniform, when Lanter asked him to assist in the chase, and it is unclear whether Thomas knew the ATF was even involved in Meyer's apprehension. Finally, both Lanter and Thomas were investigated for violations of CPD policy and disciplined by CPD. This is further evidence that they acted not on behalf of a federal agency, but on behalf of CPD.

Given the joint nature of this task force and the potential danger posed by Meyer, CPD's stake in apprehending Meyer was of equal importance to the ATF's motivations for involvement in the operation.

\*\*\*

Therefore, we affirm the district court's denial of immunity to Lanter and Thomas as they are not covered by the federal employee or official capacity clauses. Because Scalf is the only officer who meets the definition of a federal employee, we limit the analysis of step two— whether he was acting within the scope of his federal employment at the time of the incident—to him.

C.

Whether an employee was acting within the scope of their federal employment under the Westfall Act is governed by the agency law of the state in which the incident occurred. 28 U.S.C. § 1346(b)(1); *see also Dolan v. United States*, 514 F.3d 587, 593 (6th Cir. 2008). Kentucky has adopted the Restatement (Third) of Agency to define the scope of employment. *Papa John's Int'l., Inc. v. McCoy*, 244 S.W.3d 44, 51 (Ky. 2008).  An employee "acts within the scope of employment when performing work assigned by the employer *or* engaging in a course of conduct subject to the employer's control."  Restatement (Third) of Agency § 7.07(2) (2006) (emphasis added).  According to the Kentucky courts, the analysis should focus on the purpose or motive of the employee to determine whether they acted within the scope of their employment.  *Papa John's Int'l., Inc.*, 244 S.W.3d at 51.  Torts committed to further the employer's business purpose in whole or in part, "however misguided," are torts committed within the scope of employment.  *Id.* at 52 (internal quotation omitted).

The district court erred in concluding that Scalf acted outside the scope of his employment as a deputized ATF agent when he oversaw Meyer's car chase.  First, Scalf was assigned to surveil Meyer, and the ATF committed to assisting CPD "as needed" in effectuating traffic stops.  ATF Operational Plan, R. 58-1, PageID 445–46.  Scalf did the work assigned to him by the ATF when he surveilled Meyer from afar to assist Lanter and Thomas in effectuating the traffic stop.  That Scalf followed CPD procedures and used CPD radio channels when overseeing the car chase does not change the fact that he conducted that activity within the scope of the authority given to him by the ATF under the arrest plan.  *See Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000) ("[T]o be within the scope of [] employment, the conduct must be of the same general nature as that authorized or incidental to the conduct authorized.").  Meyer's apprehension was just as much in furtherance of the ATF's goals as it was of CPD's goals.  Given Scalf's unique understanding of CPD policies compared to the other ATF agents involved, it suited the ATF's purposes for him to act as the bridge between the ATF and CPD prior to and during this operation.

Further, there is no evidence that Scalf was disciplined by either the ATF or CPD for the manner in which the chase was conducted.  While the ATF's policies expressly prohibited high-

speed pursuits except in extraordinary circumstances such as "the threat of serious bodily injury or death to an agent or other party," such circumstances were present. ATF Operational Plan, R. 58-1, PageID 448. First, Meyer had a history of violence, including threatening to shoot law enforcement officers and others, and pistol whipping and holding guns to the heads of people who owed him money for drugs. Second, the day before the car chase CPD and NKDSF were informed by a reliable source that Meyer had an inoperable tumor, causing a terminal illness. As a result, Meyer had little concern for his life or the lives of others, and bragged about killing a man, kidnapping individuals for outstanding drug debts, and intended to shoot at the police and die before being jailed again. Given the potential danger Meyer posed, the ATF operational plan expressly contemplated the possibility of pursuit. Scalf's involvement in overseeing the pursuit was therefore squarely within the scope of the work assigned to him by the ATF.

Finally, the ATF's control over Scalf's actions and its involvement in the chase did not dissolve upon transfer of the chase to a CPD radio channel. The ATF was still in communication with Scalf via police radio, and Occhipinti—the ATF agent in charge of the ATF's portion of the operation—surveilled the chase from afar. Occhipinti even broadcasted via the CPD-only radio channel that Meyer was in fact in the vehicle the CPD officers were chasing.

Scalf was in the ATF's service the day of the chase, and just because he performed some duties associated with CPD's role does not demand the legal conclusion that Scalf came under CPD control. *See Does 1–10*, 973 F.3d at 598–602 (defining what actions were within the scope of federal employment where defendants were first found to be federal employees). Because Scalf's motivations were meant to further the ATF's mission, the ATF cannot now abandon its responsibility for the alleged torts committed by Scalf within the scope of his employment.

Scalf meets the requirements for Westfall Act immunity and the United States must be substituted for Scalf in this litigation.

## III.

For the foregoing reasons, we affirm the denial of Westfall Act immunity as to Lanter and Thomas and reverse the denial of Westfall Act immunity as to Scalf.

—————————————————————

## CONCURRENCE / DISSENT

—————————————————————

CHAD A. READLER, Circuit Judge, concurring in part and dissenting in part.  Three law enforcement officers took part in a joint federal-state operation to apprehend a suspect.  But the suspect proved difficult to detain, leading to a high-speed car chase.  Tragically, the fugitive crashed his vehicle into an outdoor dining area.  Two bystanders were killed, and several others were injured.  Lawsuits followed.

In the Westfall Act, Congress authorized the United States to stand in the shoes of its employees when these employees' tortious acts committed within the scope and course of their federal employment cause harm.  Should the officers here be considered federal employees for the purposes of the Westfall Act?  The district court said no.  I disagree with respect to one officer and agree with the majority opinion's decision to reverse that aspect of the district court's determination.  As to the two remaining officers, I would remand the case for further consideration.

### I.

Mason Meyer was a wanted man.  He was believed to be a prominent player in an arms- and drug-trafficking organization, and he had an outstanding warrant for felony and misdemeanor offenses.  Despite their best efforts, however, officers with the Cincinnati Police Department and the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives had been unable to detain Meyer.

When a confidential informant gave ATF the address of a Cincinnati property where Meyer was known to be staying, ATF seized the opportunity.  The Bureau drew up an operational plan to nab Meyer the next day.  The plan foresaw ATF relying on the Cincinnati Police Department's assistance.  Officers from both agencies would surveil the property, preparing to apprehend Meyer once he left the premises.  If he did so by car, the officers would try to pin the vehicle.  But if that tactic failed, pursuit was to be "initiated and monitored" in accordance with Cincinnati Police Department policy.  Per the Department's standard operating

procedures, the Cincinnati officers were to "attempt to conduct a felony traffic stop" with K-9 assistance. ATF, for its part, was to remain available to "assist as needed."

As part of the plan, officers Frank Occhipinti and Donald Scalf were assigned surveillance duties. Occhipinti was the resident agent in charge of ATF's Cincinnati Field Office and the on-scene commander for the Meyer operation. Scalf was a Cincinnati Police sergeant deputized to ATF for a five-year period, during which the operation took place. Scalf was fully embedded within ATF. He bore an ATF uniform and credentials, used an ATF-issued cell phone and email address, maintained an office inside the federal building in Cincinnati, was paid by the federal government, and was supervised by ATF officers.

On the day of the operation, Occhipinti and Scalf took their positions to observe the address provided by the tipster. That afternoon, Meyer appeared outside the residence, displaying what appeared to be the contents of a rifle case. Shortly thereafter, a black car pulled out of the property's driveway and left. Due to an obstructed view, officers positioned at the property were unable to determine whether Meyer was in the vehicle. Nonetheless, Cincinnati Police Sergeant Timothy Lanter, stationed in his cruiser on a side street, began to follow the vehicle. Before long, Occhipinti confirmed via GPS that Meyer's cell phone signal was emitting from the car. Occhipinti broadcast that confirmation over the Cincinnati Police's primary radio dispatch channel. At that point, according to Occhipinti, responsibility for the operation "turn[ed] over" to the Cincinnati Police, a change marked by a "switch[]" in radio frequency to the Cincinnati Police's primary channel from one shared by ATF and Cincinnati Police.

Hearing that Meyer was in the black car, Lanter activated his lights. Meyer accelerated; Lanter gave chase. Cincinnati Police K-9 Officer Brett Thomas, who had responded to a radioed request for help from Lanter, joined in the pursuit. During the chase, each driver reached speeds over 100 miles per hour.

As the others continued to trail Meyer, Scalf broadcast over the Cincinnati Police radio channel that he was the officer in charge of the pursuit. When Meyer approached a bridge spanning the Ohio River, Lanter radioed to Scalf for permission to cross the bridge into Kentucky. Scalf granted authorization. As the three drivers entered Kentucky, Meyer lost

control of his car, jumping the curb onto a restaurant patio. His vehicle struck Gayle and Raymond Laible. Gayle died instantly; Raymond, a short time later. Maribeth and Steven Klein, walking nearby, were struck by debris from the collision and severely injured.

The Laible estate and the Kleins sued Scalf, Lanter, and Thomas in Kentucky state court for injuries resulting from the chase. The officers removed the case to federal court. Next, they moved for certification of their immunity under the Westfall Act, a statute that limits the liability of federal officers for alleged common law torts committed in the line of duty. 28 U.S.C. § 2679(b)(1). The district court, however, denied the motion. This timely appeal followed.

## II.

In the Westfall Act, Congress provided for absolute immunity from common law tort suits for federal employees acting within the scope of their employment. 28 U.S.C. § 2679(b)(1). To understand this statutory regime, consider the evolution of two genres of federal immunity, sovereign and official. At the Founding, courts viewed the two through different lenses. For the federal government, courts shared the "universally received opinion" that the government enjoyed sovereign immunity from any suit to which it did not consent. *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12 (1821). Federal officials, on the other hand, could be subjected to common law tort suits if they injured others while performing their duties. *See* James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1874–75 (2010) ("Early federal practice thus relied on [various judicial writs] against federal officials, rather than against the government itself . . . Successful trespass and assumpsit claims . . . resulted in the entry of a judgment for money damages, payable by the officer." (footnote omitted)).

Over the course of the 20th century, those two brands of federal immunity evolved largely in opposite directions. Congress took the first step in that evolution in 1946, when it passed the Federal Tort Claims Act, which waived sovereign immunity for many common law claims. 28 U.S.C. §§ 1346(b)(1), 2674; *Brownback v. King*, 141 S. Ct. 740, 746 (2021); *cf. Allen v. United States*, 83 F.4th 564, 566–67, 574 (6th Cir. 2023) (per curiam) (holding that the government was entitled to sovereign immunity in spite of the FTCA's general waiver because a

separate statute expressly asserted sovereign immunity). The FTCA makes the federal government legally answerable, with certain exceptions, "in the same manner and to the same extent as a private individual under like circumstances" for acts taken by its employees and agents. 28 U.S.C. §§ 2674, 2680; *Osborn v. Haley*, 549 U.S. 225, 229–30 (2007). For suits against federal officers, on the other hand, the federal courts moved the needle in the other direction: they fashioned common law doctrines of immunity that shielded federal officers from suit. *See generally Barr v. Matteo*, 360 U.S. 564 (1959); Gregory Sisk, *Recovering the Tort Remedy for Federal Official Wrongdoing*, 96 Notre Dame L. Rev. 1789, 1796 (2021).

This equilibrium held for a time. But in the 1988 case of *Westfall v. Erwin*, the Supreme Court pared back official immunity, holding that absolute immunity could attach only if the challenged conduct was both within the scope of the officers' duties and was discretionary. 484 U.S. 292, 297–98 (1988).

Reflective of a period of relatively rapid legislative activity, Congress responded that same year to override *Westfall*. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 425 (1995). In the Westfall Act, an amendment to the FTCA named for the decision inspiring the legislation, Congress immunized federal officers from individual liability for claims arising out of any "negligent or wrongful act or omission," so long as the act or omission took place while the officer was "acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). Upon successful certification of that question, the officer is dismissed from the action, and the United States is substituted as defendant in the officer's place. *Id.* § 2679(d)(1)–(2).

Whether an officer was in fact acting in that capacity, Congress explained, may be certified in one of two ways. Certain Department of Justice officials are empowered to confirm immunity. *See* 28 C.F.R. § 15.4(c) (noting the supervisory role of "the Assistant Attorney General in charge of the Civil Division"). Failing that, an officer may petition a federal court for certification of Westfall Act immunity. 28 U.S.C. § 2679(d)(3); *see Lamagno*, 515 U.S. at 424–25. A court, in turn, may override the executive's withholding of immunity if two conditions are met. *U.S. Tobacco Coop., Inc. v. Big S. Wholesale of Va.*, 899 F.3d 236, 249 (4th Cir. 2018). First, the officer must qualify as an "employee of the [federal] government," as that term is defined in the statute. 28 U.S.C. § 2679(b)(1); *see also id.* § 2671. If the officer proves as much,

his challenged actions must also fall within the scope of his federal employment. 28 U.S.C. § 2679(b)(1).

In making a Westfall Act certification decision, the district court should take full stock of the facts at hand. The court must "identify and resolve" any disputed issues of fact regarding the employee's scope of employment. *Fowler v. United States*, 647 F.3d 1232, 1241 (10th Cir. 2011). Where disputed issues of fact arise, the district court "should hold such hearings as appropriate (including an evidentiary hearing if necessary), and make the findings necessary" to decide the certification question. *Id.* (quoting *Arthur v. United States*, 45 F.3d 292, 296 (9th Cir. 1995)); *see also Kearns v. United States*, 23 F.4th 807, 811–12 (8th Cir. 2022). A district court's decision denying Westfall Act certification and substitution is immediately appealable. *Osborn*, 549 U.S. at 238–39.

Here, all three officers sought certification from the Department of Justice. But certification was denied. So they asked the district court to do what the government had not. The district court, however, reached the same conclusion, and denied certification.

A. How do the three officers fare under the statutory framework set forth above? Begin with Scalf, the most straightforward case of the three. I agree with the majority that he easily meets the threshold federal employee requirement. Complementing the Westfall Act's definition of "[e]mployee of the government," 28 U.S.C. § 2671, is a separate statutory provision stating that any state or local government employee "on detail to a Federal agency" shall be considered a federal employee for FTCA purposes. 5 U.S.C. § 3374(c)(2). This includes a local police officer assigned to a task force led by a federal agency. *See Petty v. United States*, 80 F. App'x 986, 987, 989 (6th Cir. 2003) (Detroit police officer assigned to FBI-operated task force); *see also Ellis v. Ficano*, 73 F.3d 361, at *2, *6 (6th Cir. 1995) (unpublished table decision) (noting the district court's conclusion that Wayne County police officers deputized to a DEA-led task force satisfied § 3374(c)(2)'s "on detail" criterion). And that fairly describes Scalf, who, according to his own sworn statement as well as one from Occhipinti, was undisputedly deputized to the ATF. The evidence the district court credited about Scalf's employment—an ATF uniform, credentials, cell phone, email address, office, and paystub, in addition to direct

supervision by permanent ATF employees—makes that conclusion doubly clear. Simply put, Scalf met the Westfall Act's definition of a federal employee. *See* 28 U.S.C. § 2671.

Plaintiffs question whether Scalf was in fact deputized on the date of the Meyer operation. For support, they point to two federal regulations, one requiring a written formalization of deputy status and another limiting the permitted duration of continuous deputization to four years. *See* 5 C.F.R. §§ 334.106, 334.104(c). According to plaintiffs, they have been deprived of the opportunity to explore Scalf's and the ATF's compliance with these regulations. But the district court believed there was sufficient evidence to determine that Scalf was a federal employee. Plaintiffs' challenges, therefore, amount to contentions that the district court's finding of facts was clearly erroneous.

I would not go so far. In deeming Scalf to be a federal employee, the district court considered sworn statements from Scalf and Occhipinti indicating that Scalf was validly deputized. The district court did not believe fuller exploration was necessary given the mere supposition by plaintiffs that Scalf's appointment theoretically was invalid. On balance, I am not left with the "definite and firm conviction" that the district court erred. *United States v. Wilson*, 75 F.4th 633, 636 (6th Cir. 2023); *Chesnut v. United States*, 15 F.4th 436, 441 (6th Cir. 2021).

That leaves the second Westfall Act inquiry: was Scalf acting within the scope of his federal duties when he oversaw Lanter's and Thomas's pursuit of Meyer? Kentucky law on vicarious liability governs this inquiry. *Does 1–10 v. Haaland*, 973 F.3d 591, 599 (6th Cir. 2020) ("[W]hether the federal employee was acting within the scope of his or her employment[] is governed by the agency law of the forum state." (citation omitted)); *see Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 51 (Ky. 2008) (setting forth Kentucky's scope of employment test). Employing that legal regime, I would ask whether Scalf was "performing work assigned" by ATF or "engaging in a course of conduct subject to" ATF's control, as opposed to simply undertaking "an independent course of conduct" through which he did not intend to further ATF's purpose. *Papa John's Int'l*, 244 S.W.3d at 51 (quoting Restatement (Third) of Agency § 7.07 (2006)).

To my mind, the facts before us compel the conclusion that Scalf was acting within the scope of his employment as an ATF agent when he supervised the Meyer chase. As a starting point, ATF assigned Scalf to its surveillance team in its operational plan. What is more, Occhipinti, as ATF agent in charge, had the authority to supervise Scalf's handling of the chase—including to order him to call it off—even if Occhipinti did not exercise that power. In these ways and others, Scalf's conduct was "subject to" ATF control. *Papa John's Int'l*, 244 S.W.3d at 51.

Some evidence, I acknowledge, muddies the waters. For one, the operational plan assigned all traffic stops to Cincinnati Police (to ATF's exclusion). For another, Scalf appears to have invoked Cincinnati Police policy in directing the pursuit of Meyer. For purposes of the Westfall Act, however, the scope of employment inquiry operates against the backdrop of the threshold federal employee requirement. The district court's findings suggest that Scalf was exclusively in ATF's service on the date of the operation. *See Does 1–10*, 973 F.3d at 598–602 (examining whether certain actions were within the scope of federal employment only after determining that defendants were federal employees). With that understanding in mind, even if Scalf behaved as the plan foresaw a Cincinnati Police officer acting, he was still wearing ATF clothes (figuratively and, it appears, literally) when he did so. In other words, simply because Scalf performed some duties associated with the Cincinnati Police's role in the operational plan does not mean that, as a legal matter, he traded his ATF hat in for a Cincinnati Police one.

B. Lanter and Thomas present a more difficult case. All agree that the two were employed by the Cincinnati Police Department, and thus do not qualify as federal employees in the conventional sense. But they are still entitled to Westfall Act immunity if they can show they were "acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. This "official-capacity clause," as the Seventh Circuit has named it, has so far gone unexplored in our Court. *Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022). With the statutory ground untilled in our local terrain, I would turn to traditional interpretive rules to understand Congress's textual command.

The "official-capacity clause" in fact amounts to three constitutive clauses—(1) "acting on behalf of a federal agency in an official capacity," (2) "temporarily or permanently in the service of the United States," (3) "whether with or without compensation." Each contains prepositional phrases that reveal something about the object of the clause. *See United States v. Cunningham*, 630 F. App'x 873, 878 n.6 (10th Cir. 2015). Specifically, Congress modified "acting on behalf of a federal agency" with the prepositional phrase "in an official capacity." And that phrase, in turn, is modified by the phrases "in the service of the United States" and "with or without compensation."

Begin with the first clause: "acting on behalf of a federal agency in an official capacity." At the time of the FTCA's passage, "behalf," when used in the prepositional phrase "on behalf of," meant "[o]n the side of, literally . . . [o]n the part of (another)." *Behalf*, Webster's New International Dictionary (2d ed. 1953). The second phrase, "in an official capacity," cabins the scope of the first. In other statutory contexts, "official capacity" is understood to encompass "actions . . . that reasonably can be construed to be within the scope of [one's] duties and consistent with the general responsibilities and objectives of [one's] position." *Wee Child Care Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 848 (6th Cir. 2012) (quoting *Sandcrest Outpatient Servs., P.A. v. Cumberland County Hosp. Sys., Inc.*, 853 F.2d 1139, 1145 (4th Cir. 1988)); *see also Official* (adj.), Funk & Wagnalls New Standard Dictionary (1943 ed.) (defining official as "[d]erived from the proper office or officer, or from the proper authority"). So, to act on behalf of a federal agency in an official capacity requires more than merely supporting or aiding a federal agency. Otherwise, the language "in an official capacity" would amount to mere surplusage. *In re Davis*, 960 F.3d 346, 354–55 (6th Cir. 2020). In other words, "acting on behalf of a federal agency in an official capacity" is something more formal, and must encompass some authorized action.

The FTCA also requires that the individual in question act "in the service of the United States" either in a temporary or permanent fashion. 28 U.S.C. § 2671. Although this phrase is yet undefined in our case law, I glean an understanding from the word "service." In the 20th century, "service" was understood as performance of labor either "for the benefit of another" or "at another's command." *Service*, Webster's New International Dictionary (2d ed. 1953). These

definitions indicate that "in the service of" requires acting at the directive of the United States. After all, if the phrase simply meant "performing labor to benefit," that would be redundant with the first clause, "acting on behalf of." *See Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001).

That leaves the last phrase in the provision ("with or without compensation"). It sets forth one final instruction: that an individual's "official capacity" status does not turn on whether the individual is paid for the act.

Reading these three clauses together, under the "official-capacity clause," an individual must be performing duties on the side of the federal government, with authority derived from the federal government, at federal directive.

This understanding is in accord with adjacent Supreme Court authority from the period following the statute's enactment. *See Logue v. United States*, 412 U.S. 521 (1973). *Logue* concerned an FTCA suit filed against a county jail alleging that jail officials negligently supervised a prisoner. *Id.* at 522–25. In making that claim, the plaintiffs argued that the jail qualified as a "federal agency," aiming to make the federal government liable for the purported negligence of the jail's employees. *Id.* at 525–26. Relevant to the Supreme Court's assessment was the federal government's degree of control over the jail. "[T]he authority . . . to control . . . detailed physical performance," the Supreme Court explained, is a weighty consideration in deciding whether an entity should be deemed a federal agency for FTCA purposes. *Id.* at 527–28. Applying that standard, the Supreme Court held that the jail was more like a contractor than a federal agency, and thereby satisfied the statute's exemption of "contractors" from its definition of "federal agency." *Id.* at 527–30.

The district court concluded that Lanter and Thomas were not "supervised or directed by the federal government." That was believed to be the case, the district court reasoned, because the two took direction from Scalf, who was deemed not to be acting within the scope of federal employment. In my view, that conclusion deserves a second look.

To start, all here agree that, for today's purposes, Scalf was a federal employee. Given Scalf's interactions with Lanter and Thomas, he arguably exercised federal authority over the two, such that Lanter and Thomas could fairly be said to have "serv[ed]" the federal government

"in an official capacity."  28 U.S.C. § 2671.  For example, the district court found that Scalf identified himself as the officer in charge of the pursuit of Meyer, and authorized Lanter and Thomas to cross the Ohio River.  From this factual tapestry, it seems that Scalf, in at least some respects, directed the actions of Lanter and Thomas.  Perhaps the two were also taking orders from Cincinnati Police officers before or during the chase.  Or it could be that they directed each other in some meaningful way:  the district court, for example, found that Lanter "initiated a pursuit" of Meyer when he fled, later "direct[ing]" Thomas to join him.  Likewise, the breadth of the relevant statutory terms, read together with *Logue*, suggests that the "authority to directly control" consideration is a sufficient, but not necessary, ingredient of federal employee status under the official-capacity clause.  *See, e.g.*, *U.S. Tobacco Coop., Inc.*, 899 F.3d at 250–52 (considering whether confidential informants could, in the absence of government direction, be deemed federal employees under the official-capacity clause).

In light of these (and other) unanswered questions, I would remand for the district court to address these factual issues in the first instance, taking account of the holding that Scalf falls within the ambit of Westfall Act immunity.  The district court would then need to address the companion Westfall Act inquiry—whether Lanter and Thomas were acting within the scope of any federal employment.  28 U.S.C. § 2679.  That fact-specific analysis is work the district court is well equipped to perform.  *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018) (describing district courts' competence in resolving factual issues).

For these reasons, I would reverse the judgment of the district court with respect to Scalf and vacate and remand with respect to Lanter and Thomas.