NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0263n.06

Case No. 25-1465

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| TREY CHOLEWA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant-Appellee, | ) | |
| | ) | |
| JENNIFER R. ROBINSON, M.D., | ) | O P I N I O N |
| Defendant-Appellant. | ) | |
| | ) | |

Before: BOGGS, NALBANDIAN, and MATHIS, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Dr. Jennifer Robinson treated Trey Cholewa, a Marine Corps veteran with multiple combat tours, for psychiatric ailments. Over the course of treatment, she allegedly developed romantic feelings for him and touched him sexually. So he sued her and the United States under Michigan tort law. At each stage of the proceedings, Dr. Robinson petitioned the district court to grant her immunity under the Westfall Act, 28 U.S.C. § 2679, which protects federal employees acting within the scope of their employment from facing suit for tort damages. The district court denied that relief twice—once at the pleadings stage, and again after discovery at summary judgment. The latter denial led to an earlier appeal, a remand, and a third round of consideration complete with an evidentiary hearing and factual findings.

In its third ruling on the matter, the district court granted Dr. Robinson's immunity petition in part. She received immunity as to the claims based on her non-sexual, non-romantic tortious

conduct. But the district court left her potentially liable as to the claims alleging sexual or romantic impropriety. So Dr. Robinson appealed, arguing that the district court erred by finding that she'd committed the alleged acts as a factual matter, and that, in any case, she's entitled to suit-wide immunity if she's entitled to immunity on even one claim. We disagree, so we affirm.

## I.

Cholewa's service in the Marine Corps left him with a host of medical problems. Four tours of active combat[1] inflicted anxiety, PTSD, memory issues, recurring physical pain, and episodes of disconnection from reality, among other maladies.

He returned to California from his fifth and final deployment in 2012. After unconsciously choking his wife during a sleepwalking episode, Cholewa sought psychiatric treatment. Upon evaluating him, Cholewa's physicians rated him as 100% disabled. Cholewa was medically discharged from the Marines in 2015.

After leaving the Marines, Cholewa moved his wife and family back to their home state of Michigan. He remained debilitated. So he sought treatment at the local Veterans Affairs (VA) facility, the John D. Dingell Department of Veterans Affairs Medical Center (the VA Center). There, he requested—as he'd done before—a female psychiatrist. Dr. Jennifer Robinson answered the call and began treating Cholewa in 2015. That treatment lasted until June 2018, spanning 21 documented appointments and additional, off-the-books sessions. All their interactions took place in Dr. Robinson's office at the VA Center.

Once in Michigan under Dr. Robinson's care, Cholewa engaged in an extramarital affair. After his wife Yvonne grew suspicious of his changed behavior, she "d[id] some detective work"

---

[1] Cholewa deployed five times, but the fourth didn't involve active combat.

in 2016 and discovered his infidelity. R.56-15, Yvonne Cholewa Dep., PageID 1267. Over the next two years, the Cholewas traded divorce filings before finalizing their split in 2018. They've since gotten reengaged. In both spouses' telling, the affair was the straw that broke the camel's back. But both also agree that it wasn't the biggest factor. Instead, both agree that the affair was itself a mere symptom of the real malady: Cholewa's experience with Dr. Robinson. Dr. Robinson "gave [Cholewa] almost instruction . . . to go outside of [his] marriage," which was a "huge" factor in his divorce. R.56-2, Trey Cholewa Dep., PageID 684. The "biggest stress" in the Cholewas' marriage—precipitating Trey's affair and the divorce proceedings—"was what was going on with Dr. Robinson." *Id.* at PageID 684.

After Dr. Robinson "really damaged" Cholewa's "life and [his] relationship with [his] wife," *id.*, he filed an administrative complaint with the VA Center alleging that Dr. Robinson "had made inappropriate, romantic, physical, and sexual advances toward him." That kicked off an investigation by Dr. Nicole Stromberg, the Chief of Staff at the VA Center. She investigated and compiled a report about Dr. Robinson's conduct, reviewing phone records, interviewing VA Center staff (including Dr. Robinson), and even attempting (unsuccessfully) to reach Cholewa multiple times. While none of those data points conclusively proved illicit activity, they "combine[d] to leave" Dr. Stromberg "with no option other than to recommend that Dr. Robinson be relieved of all patient care duties." R.56-9, Stromberg Report, at PageID 1091. Despite that recommendation, the VA Center took the less-drastic step of transitioning Dr. Robinson from outpatient care to inpatient care.[2]

---

[2] The VA later revoked Dr. Robinson's clinical privileges, but only after Cholewa produced audio recordings during discovery in this lawsuit of conversations, purportedly with Dr. Robinson, discussing their sexual and romantic encounters.

Unsatisfied with that outcome, Cholewa filed this lawsuit. His complaint laid out three counts against Dr. Robinson and the United States: (1) medical malpractice, (2) ordinary negligence, and (3) medical battery. Those counts center on different allegations as to the two defendants. So in construing the *claims* underlying the counts, the district court further subdivided Cholewa's theories of relief as they apply to each defendant. As to Dr. Robinson, the claims center upon her allegedly (1) sexually improper acts, (2) romantically improper acts, and (3) improper acts that were neither sexual nor romantic. And while Cholewa wants to hold Dr. Robinson accountable for the acts themselves, his claims against the United States revolve around the government's supervisory role over Dr. Robinson.

Then came a hearty course of motions practice and discovery. First, the defendants moved to dismiss, which the district court denied in their entirety. Then, the defendants filed motions for summary judgment. The district court granted the United States's motion in part and again denied Dr. Robinson's motion in its entirety. It's unnecessary for us to lay out the claims remaining against the United States after summary judgment, because this appeal centers on the direct-liability claims against Dr. Robinson.

But the issues before us don't concern any of the merits proceedings below. Instead, they center on Dr. Robinson's quest for immunity under the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679, commonly known as the Westfall Act. That statute offers federal-employee defendants immunity from suit so long as they were "acting within the scope of [their] office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). An employee's first stop to obtain Westfall Act immunity is with the Attorney General. *Id.* If the Attorney General certifies that the employee acted within the scope of their employment at the relevant time, the court must dismiss the employee-defendant and

4

substitute the United States in her place. *Id.* But if the Attorney General refuses to certify, the employee-defendant can petition the district court to make the necessary scope-of-employment finding and substitute her out. *Id.* § 2679(d)(3).

Dr. Robinson has been petitioning the court for immunity and substitution under the Westfall Act since the pleadings stage. When Dr. Robinson moved to dismiss, she petitioned the district court to certify her acts as within the scope of her employment and grant her immunity.[3] Unsurprisingly (because it's necessary to his supervisory claims against the United States), Cholewa agreed—even before Dr. Robinson petitioned for substitution—that she was acting within the scope of her employment throughout their relationship. But the district court denied Dr. Robinson's petition.

After discovery, Dr. Robinson again petitioned the district court to substitute her out—this time with the benefit of a developed factual record. The district court held a hearing on the motion. There, the parties "all advised the court that they saw no need for it to hold an evidentiary hearing before ruling on the petition" and that the petition presented "a pure question of law." *Cholewa v. United States* (*Cholewa I*), No. 23-1278, 2024 WL 869550, at *3 (6th Cir. Feb. 29, 2024). So that's how the district court analyzed the petition. It held that the "alleged conduct falls outside the scope of [Dr. Robinson's] employment as a matter of [Michigan] law," requiring the court to deny her petition. R.92, Op. & Order, PageID 4492. So it denied the petition.

Dr. Robinson appealed that denial. That kicked off the first round of appellate review in this case. The *Cholewa I* panel reversed the district court—less for its conclusion than for its approach. The panel held that the district court was required to make factual *findings*—not

---

[3] In its separate motion to dismiss, the United States represented that the Attorney General had declined to certify Dr. Robinson's conduct.

assumptions based on the parties' stipulations—as to whether the alleged events happened. *Cholewa I*, 2024 WL 869550, at *3 (citing *Osborn v. Haley*, 422 F.3d 359, 364 (6th Cir. 2005)). Notably, the panel didn't take issue with the district court's view of Michigan law, but only with its failure to make the requisite findings of fact before applying that law.

So on remand, the district court held an evidentiary hearing. There, it heard testimony from Cholewa, Dr. Robinson, and Dr. Stromberg (Dr. Robinson's supervisor-turned-investigator). And it heard an audio recording that Cholewa produced, where Dr. Robinson allegedly tells Cholewa she "think[s] [she] happen[s] to be in love" with him. *See* R.144, PageID 5041–43. On top of all of that, the district court listened to Dr. Robinson repeatedly invoke her Fifth Amendment right against self-incrimination when asked to rebut Cholewa's testimony and the recording. So because she failed to rebut Cholewa's affirmative evidence, the district court took an adverse inference against Dr. Robinson. And that adverse inference, coupled with the affirmative evidence, led the district court to "conclude[] that Dr. Robinson has had sexual contact with [Cholewa]." R.144, PageID 5058.

Having found that Dr. Robinson committed the alleged improper acts, the district court again denied Robinson's petition in part. Applying Michigan law as it described in its earlier opinion, the district court held that Dr. Robinson's sexual and romantic acts fell outside the scope of her employment. But it held that those of her acts that weren't sexual or romantic, but nonetheless breached her duty of care,[4] were within the scope of her employment. *Id.* So Dr. Robinson remained on the hook as to the former category and received immunity on the latter.

---

[4] This category includes Dr. Robinson's "failure to obtain an accurate history, failure to obtain necessary referrals, failure to properly document patient sessions, failure to refrain from exploiting her power differential over [Cholewa], failure to discontinue the professional and therapeutic

Dr. Robinson appealed. She argues that (1) the district court erred by taking a negative inference, given her invocation of the Fifth Amendment during questioning and (2) because the district court granted her petition as to some claims, it had to grant it as to all claims. The United States filed its appellee brief defending the judgment below. Cholewa filed his appellee brief *attacking* the district court's judgment—but for reasons orthogonal to Dr. Robinson's, as discussed below.

## II.

This appeal turns on three questions. First, whether the district court clearly erred in finding that Dr. Robinson committed the alleged acts. Second, whether the district court misapplied Michigan agency law to the found facts to determine whether Dr. Robinson acted within the scope of her employment. And third, whether the Westfall Act confers immunity as to all claims in a lawsuit if it applies to even one claim.

## A.

We start with the district court's factual findings. Despite Dr. Robinson's argument to the contrary, we conclude that the district court (1) properly took an adverse inference in light of Dr. Robinson's repeated Fifth Amendment invocations and (2) had sufficient circumstantial and testimonial evidence to support its findings in any case.

When a district court makes factual findings to support its decision on a Westfall Act certification petition, we review those findings for clear error. *Laible v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (citing Fed. R. Civ. P. 52(a)(6)). And if the district court plausibly construes evidence in the record, "no clear error has occurred." *Id.* at 442–43 (citing *United States v. Sands*,

---

physician-patient relationship . . . , and failure to refer [Cholewa] to an alternative psychiatrist." R.144, PageID 5064.

4 F.4th 417, 420 (6th Cir. 2021)); *Pledger v. United States*, 236 F.3d 315, 320 (6th Cir. 2000). So we won't reverse unless we're "left with the definite and firm conviction that a mistake has been committed," even if we'd reach a different conclusion on a fresh review of the facts. *Laible*, 91 F.4th at 443 (quoting *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018)); *Pledger*, 236 F.3d at 320–21. Moreover, we "must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). But clear-error review doesn't "inhibit" the panel's "power to correct errors of law, including those that may infect a finding of fact that is predicated on a misunderstanding of the governing rule of law." *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 429 (6th Cir. 2020) (citation modified) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984)).

Dr. Robinson challenges two aspects of the district court's factual findings. First, she contests its application of an adverse inference in response to her assertions of her right against self-incrimination. And second, she argues that without the adverse inference, the court didn't have sufficient evidence to find that she committed the alleged improprieties. Both arguments fall short.

**1.**

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As its terms suggest, that guarantee operates differently in the civil and criminal contexts. One of the right's dimensions prohibits courts and juries—in criminal cases—from drawing negative inferences from a defendant's silence in the face of questioning. *Mitchell v. United States*, 526 U.S. 314, 327–28 (1999) (citing *Griffin v. California*, 380 U.S. 609, 614 (1965)). But the rule relaxes in the civil context. There, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they

8

refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

The touchstone for applying an adverse inference is whether other record evidence exists to independently support the inferred fact. *See id.* at 316–19. Without requiring such support, the defendant's fate could hinge solely on his decision to remain silent: either invoke the Fifth and automatically lose your civil case, or answer and risk criminal prosecution. *Id.* (discussing *Lefkowitz v. Turley*, 414 U.S. 70 (1973), and *Garrity v. New Jersey*, 385 U.S. 493 (1967)). That would amount to "an invalid attempt" to "compel testimony" by "penaliz[ing] the exercise of the privilege" with an automatic civil penalty. *Id.* at 318.

Sixth Circuit caselaw affirms that principle. For example, in *Hoxie v. Drug Enforcement Administration*, this court considered the plaintiff's argument that the DEA punished his Fifth Amendment invocation by revoking his license to prescribe controlled substances. 419 F.3d 477, 483 (6th Cir. 2005). The panel disagreed, noting that the DEA had other "substantial evidence" in the form of the plaintiff's "past trouble with the law" and his "denials of past legal trouble, which are contradicted by [his] arrest records." *Id.* at 482–83. So his "silence was evidence on which the DEA could rely" because it accompanied evidence of "his other actions." *Id.* at 483. And in *Leapers, Inc. v. SMTS, LLC*, this court dealt with a corporate competitor's refusal to testify about the functionality of the plaintiff's product in an intellectual-property lawsuit. 879 F.3d 731, 739 (6th Cir. 2018). That silence, combined with other circumstantial evidence, would've allowed a reasonable jury to apply an adverse inference and find that the defendant's product was "*non*function[al]." *Id.* at 739–40 (noting that the plaintiff also produced evidence of the competitor's patent-filing decisions, which independently supported a finding of nonfunctionality).

Here, the district court respected the Fifth Amendment's command by marshaling corroborating record evidence to support its adverse inference. It started with "direct" evidence, quoting at length from an audio recording that purportedly captured[5] a treatment session in which Dr. Robinson told Cholewa that she "think[s] [she] happen[s] to be in love with [him]." R.144, PageID 5041–43. Then it combed through a bevy of circumstantial evidence collected by the investigating supervisor during the VA Center's internal investigation. That included (1) the anomalous call volume between Dr. Robinson and Cholewa (representing three times more calls than her next-most-frequently called patient); (2) Dr. Robinson's refusal to share her cell-phone records in even redacted form; (3) Dr. Robinson's failure to document all her sessions with Cholewa; and (4) Dr. Robinson's admission to the investigating supervisor that she might've "crossed . . . professional boundaries" with Cholewa. *Id.* at PageID 5043–44; R.139, Evidentiary Hr'g Tr., PageID 4884–85. And finally, the district court canvassed the testimony it heard at the evidentiary hearing. On that front, the district court found Cholewa to have "some credibility" because even though the details of his story morphed over the course of the litigation and he couldn't recall many details, the audio recording supported his allegations. R.144, PageID 5054–56.

At day's end, Dr. Robinson "made a voluntary tactical decision" to repeatedly plead the Fifth and opt not to rebut Cholewa's evidence, "the consequence of which [s]he must now face." *Nat'l Acceptance Co. of Am. v. Bathalter*, 951 F.2d 349, 1991 WL 263474, at *3 (6th Cir. Dec. 9, 1991) (unpublished table decision). And the district court didn't misapprehend the legal standard

---

[5] Dr. Robinson pleaded the Fifth when asked to validate the recordings. And she never objected or offered testimony to rebut Cholewa's authentication. So the district court drew an adverse inference that the recording was authentic.

governing that consequence—i.e., adverse inferences—nor did it err in applying that standard to the facts.

**2.**

The district court didn't clearly err in weighing the evidence before it—including the negative inference discussed above—to find that Dr. Robinson engaged in sexual and romantic misconduct when treating Cholewa.

While it's "not nugatory," the Sixth Circuit's clear-error standard for factual findings is "deferential." *Friedlander*, 978 F.3d at 428–29 (quoting *Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 778 (6th Cir. 2006)). Under that standard, reviewing courts deem a factual finding "clearly erroneous only where it is against the clear weight of the evidence or when upon review of the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *West v. Fred Wright Constr. Co.*, 756 F.2d 31, 34 (6th Cir. 1985) (citation modified). It's "not enough" that the panel might weigh the facts differently or reach a different conclusion. *Id.* And the appellate court "should not lightly set aside" the district court's credibility determinations. *Id.*

The district court made reasonable credibility determinations, weighed the facts, and drew defensible conclusions from those facts. After this court's remand in *Cholewa I*, the district court held an evidentiary hearing. There, it heard testimony from Cholewa, Dr. Robinson, and Dr. Stromberg. It heard Dr. Robinson tell Cholewa she loved him on the audio recording. And after using the audio recording as a reliable cross-reference, it determined that Cholewa's testimony was credible. Specifically, the district court found that Cholewa's testimony and the audio recording supported Cholewa's allegations that "Dr. Robinson professed her romantic feelings for him, and at the very least kissed and massaged him," as well as his "general allegation that sexual

11

touching occurred at some point." R.144, PageID 5056 (citation modified). On top of all of that, the district court listened to Dr. Robinson repeatedly invoke her Fifth Amendment right against self-incrimination when asked to rebut Cholewa's testimony and the audio recording.

In arguing that the district court clearly erred, Dr. Robinson clutches at straws. She portrays a district court far less certain that it was. To do so, she quotes the district court sparingly, narrating that the district court based its finding "on evidence it describes . . . as 'not directly probative of sexual contact,' 'not conclusive,' 'not entirely credible,' and 'difficult to believe.'" Appellant Br., p.10 (quoting R.144, PageID 5052–54). Her selected quotes don't show the full picture. Each of the selected phrases is either incomplete, accompanies the district court's description of a discrete piece of evidence *standing by itself*, or both. Take for example the district court's discussion of the audio recording. It remarked that the recording wasn't "directly probative of sexual contact, but arguably suggest[s] that the contact occurred." R.144, PageID 5053. In other words, it wasn't enough by itself—but it still supported Cholewa's story. Same with Cholewa's testimony. On that front, the district court stated that Cholewa's "testimony is not entirely credible, but has some credibility." *Id.* at PageID 5054 (citation modified). And when it combined the recording with the testimony, it held that Cholewa's testimony was "reliable in part, because the audio recording supports his allegations." *Id.* at PageID 5056. And Dr. Robinson left out the district court's operative conclusion: that "the evidence *is* conclusive that Dr. Robinson had a romantic relationship" and "sexual contact." *Id.* at PageID 5050, 5052 (citation modified).

For those reasons, we hold that the district court acted within its discretion to weigh the evidence and find the facts as it did.

**B.**

With Dr. Robinson's arguments about the facts settled, we turn our attention to Cholewa's arguments about the district court's application of Michigan law to those facts. They're not properly before us, but even if they were, they wouldn't lead to reversal.

As a reminder, Cholewa joins Dr. Robinson in seeking reversal. But he goes about it by taking a position that simultaneously runs opposite to hers and yet also goes further. Cholewa's position is opposite to Dr. Robinson's in that he supports the district court's factual findings, while Dr. Robinson asks us to reverse those findings. And yet his position goes further than hers by contesting the district court's application of Michigan law, which Dr. Robinson doesn't do. As we explain below, the latter claim can't help Cholewa because he failed to file a cross-appeal. That said, we briefly address his arguments to show why they wouldn't change the outcome even if they were properly before us.

**1.**

The problem with Cholewa's posture in this appeal centers on whether his arguments *against* the district court's reasoning are properly before us. They aren't. Any party challenging the lower court's judgment must file a cross-appeal. But rather than honor that bedrock rule of appellate process, Cholewa asks the panel to "reverse the district court's denial" of Dr. Robinson's petition in his brief. Cholewa Br., p.19.[6]

---

[6] The government frames its argument that Cholewa isn't properly before this court in terms of "standing." United States Br., p.16. But if the government's focus is "standing to appeal"—and it's not clear that it is, given the sparseness of its briefing on the issue—Cholewa passes muster. That species of standing requires appellants to be "aggrieved" by the judgment that they contest. *See United States v. Windsor*, 570 U.S. 744, 759 (2013). It's a prudential rule arising out of "the statutes granting appellate jurisdiction and the historic practices of the appellate courts," not in the "jurisdictional limitations of Art. III." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333–34

Cholewa briefed and argued this case as an appellee—i.e., as a party *defending* the judgment below. Appellees can *support* a district court's judgment while still criticizing its reasoning. *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479–80 (1999) ("[A]n appellee may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court.'" (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924))). But he can't attack the judgment itself, that is, seek a different judgment, without a cross-appeal. *Id.* at 480 (noting the "more than two centur[y]"-old "prohibition on modifying judgments in favor of a nonappealing party"). Indeed, to heed Cholewa's arguments would be to disregard the "institutional interests" protected by the cross-appeal doctrine: "fair notice and repose." *Id.*

Zooming into Cholewa's arguments against the district court's judgment—and how they differ from Dr. Robinson's—explains why considering them would run afoul of the cross-appeal rule. Both parties want the panel to reverse the district court and substitute the United States into Dr. Robinson's place. But they take converse approaches to get there. As a reminder, the district court structured its approach to certification in two stages. First, it determined whether, as a matter of fact, Dr. Robinson engaged in the alleged acts. And second, it applied Michigan law to the facts it found to answer whether Dr. Robinson acted within the scope of her employment.

Now back to the parties before the panel. Dr. Robinson challenges only the first stage of the district court's analysis—its finding that she engaged in romantic and sexual conduct with Cholewa. But she doesn't say a word against the district court's holding that such conduct is,

_____

(1980). Here, it appears that Cholewa *was* aggrieved by the district court's decree. After all, he's stood beside Dr. Robinson's scope-of-employment arguments from the get-go.

under Michigan law, outside the scope of employment. Cholewa does the opposite. He defends the district court's factual findings—sensibly enough, since his case depends on showing that Dr. Robinson acted improperly during their appointments. But he attacks its view of Michigan law. In Cholewa's view, Michigan agency rules would deem Dr. Robinson to be "acting in service" of the VA Center and therefore within the scope of her employment. Cholewa Br., p.6.

The fact that Cholewa's arguments attacking the judgment differ from Dr. Robinson's matters because the party to whom he's most clearly adverse in this appeal—the United States— had no opportunity to respond. Dr. Robinson, as the appellant, filed her brief first. So the United States had the benefit of knowing the substance of her arguments while assembling its own. So it filed its brief on September 19, 2025, responding to Dr. Robinson's arguments. Along came Cholewa, filing his brief a month later, on October 17, 2025. He presented an argument (1) against the judgment below that (2) differed from Dr. Robinson's. So the United States wasn't on notice that it'd be fighting those arguments on appeal, depriving it of the opportunity to present its counterarguments.[7]

---

[7] To be sure, the United States anticipated that Cholewa would make some argument on this point, which we can glean from its "standing on appeal" argument. *See supra* n.7. It probably saw Cholewa's Michigan-law argument coming down the pike because he presented a similar argument—attacking the district court's understanding of Michigan law—as an appellee in *Cholewa I*. *See* Appellee Br., pp.7–13, *Cholewa I*, No. 23-1278 (6th Cir. July 21, 2023). Critically, though, Robinson, as the appellant, made that same argument herself in the earlier appeal. *See* Appellant Br., pp.10–21, *Cholewa I*, No. 23-1278 (6th Cir. May 19, 2023). In other words, Cholewa got lucky the first go-round because Robinson presented her preferred argument attacking the judgment. But Robinson abandoned that argument this time, and Cholewa didn't position himself on the proper side of the "v." to preserve it himself. So even though the government was on "notice"—in a thin sense—that a party opposed to the judgment might have an argument contesting the district court's interpretation of Michigan law, it had no indication that it'd have to respond to such an argument in this appeal. To hold it to a higher standard would be to require appellees to prophylactically respond in their opening briefs to arguments abandoned by the appellant. On top of that, it would allow Cholewa to sandbag by hiding his argument against

For that reason, we apply the rule requiring cross-appeals and decline to consider Cholewa's arguments to the extent that they attack the district court's judgment. That said, if relying on a "technicality" seems unsatisfying, rest assured that those arguments wouldn't have changed the outcome even if they were properly before us.

**2.**

The district court properly interpreted Michigan law to hold that psychiatrists who engage in sexual or romantic relationships with their patients for their own gain act outside the scope of their employment. Although we review a district court's findings for clear error, we probe its "conclusions of law" and "application of the law to the facts" de novo. *Singleton v. United States*, 277 F.3d 864, 870 (6th Cir. 2002), *overruled on other grounds by Hawver v. United States*, 808 F.3d 693 (6th Cir. 2015).

Federal courts determine scope-of-employment questions based on "the agency law of the state in which the incident occurred." *Laible*, 91 F.4th at 445. Here, the relevant state law is Michigan's. And under Michigan law, an employee's conduct falls within the scope of her employment when she "act[s] in furtherance, or the interest, of the employer's business." *Hamed v. Wayne County*, 803 N.W.2d 237, 244 (Mich. 2011); *see also Tolbert v. United States*, No. 17-10273, 2017 WL 6539254, at *2 (E.D. Mich. Dec. 21, 2017) (applying *Hamed* test to hold VA substance-abuse counselor's sexually improper conduct outside the scope of his employment). That holds true even if the employee's acts were "contrary to [her] employer's directions," so long as the act "further[ed]" the employer's interests. *Hamed*, 803 N.W.2d at 244. But when the

---

the judgment until it's too late for the government to respond, which would weaken our commitment to a fair adversarial process.

employee engages in "independent" action "intended solely to further [her] individual interests," her actions fall outside the scope of her employment. *Id.* (citation modified).

The district court properly discerned the contours of Michigan agency doctrine to hold conduct like Dr. Robinson's outside the scope of employment. Although it recognized that "neither Michigan nor federal courts construing Michigan law have addressed the *very narrow set* of circumstances present in this case," R.92, PageID 4486 (emphasis added), the district court marshaled more than enough jurisprudential evidence to make sense of the case law and figure out how the case should come out under Michigan law.

Indeed, the district court's approach was more scrupulous than necessary. It defined the question with granularity: whether "a mental health professional mismanaging transference, leading her to engage in sexual misconduct with her patient under the guise of treatment," acts within the scope of her employment. R.92, PageID 4486. It's true that no Michigan Supreme Court decision addresses that *exact* scenario. But multiple cases—of which the district court took stock—come close in all material respects.

To start, Dr. Robinson's actions fall outside the test the Michigan Supreme Court has defined for scope-of-employment questions. Under that test, employees who act "contrary to an employer's instructions" are still within the scope if they "accomplish[] the act in furtherance, or in the interest, of the employer's business." *Hamed*, 803 N.W.2d at 244 & n.26 (citing *Barnes v. Mitchell*, 67 N.W.2d 208, 210–12 (Mich. 1954)). In *Hamed v. Wayne County*, the Michigan Supreme Court confronted a scenario involving jailhouse sexual assault. 803 N.W.2d at 242. A correctional officer assaulted Hamed in detention. The question before the state supreme court was whether the officer's employers could be held vicariously liable for "quid pro quo sexual harassment affecting public services" under Michigan law. *Id.* at 243. The Michigan Supreme

17

Court said no.[8]  *Id.* at 258.  And at no point did it even consider that the employee's conduct could've been *within* the scope of his employment.  And in another case, *Zsigo v. Hurley Medical Center*, the Michigan Supreme Court recognized that a nurse's aide who sexually assaulted a restrained patient was "clearly not acting within the scope of his employment when he engaged in acts of sexual misconduct" with the patient.  716 N.W.2d 220, 229 (Mich. 2006).

Two interrelated features of the *Hamed* and *Zsigo* decisions support the district court's decision here.  First, both cases defined the scope-of-employment inquiry at a high level of generality.  In both *Hamed* and *Zsigo*, the court found it relevant that the defendant-employees were institutional personnel (one in a hospital, the other in a prison) who used their positions of trust and authority to sexually exploit their institution's charges.  *Hamed*, 803 N.W.2d at 244 ("Here, there is no question that Johnson's sexual assault of [the] plaintiff was beyond the scope

---

[8]  The Michigan Supreme Court also rejected Hamed's argument invoking an exception to the scope-of-employment requirement.  That exception applies when the employee-defendant's conduct was "aided by agency"—in other words, when he couldn't have harmed the plaintiff but for his position of employment.  *See Hamed*, 803 N.W.2d at 248–49 (overruling *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 602 (Mich. 1996)).  In the *Hamed* court's view, such a "broad" conception of the scope of employment would amount to "seemingly unlimited strict liability," since arguably *anything* an employee does while on the job—even sexually assaulting a subordinate or inmate—is "aided" by the fact of his employment.  *Id.* at 254.  And the court found it especially concerning that "[s]uch a standard would apply to a wide range of public-service providers . . . including teachers, correctional and probation officers, [*and*] *physicians*."  *Id.* (emphasis added); *see also Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 222, 229 (Mich. 2006) (declining to adopt aided-by-agency exception to employer immunity in a case involving a nursing assistant sexually assaulting a patient).

The aided-by-agency exception isn't relevant here because it doesn't answer the first-order scope-of-employment question.  Instead, it offers an exception to the rule against vicarious liability for conduct that's already been deemed outside the scope of employment—and even then, one that's disavowed by Michigan law.  But the *Hamed* court's extended engagement with the *exception* to the scope-of-employment requirement shows that the underlying sexual misconduct was *outside* the scope of employment as a matter of law.  *Id.* at 258; *see also Zsigo*, 716 N.W.2d at 222, 230–31 (Mich. 2006) (noting that a nurse's aide who sexually assaulted a restrained patient was "clearly not acting within the scope of his employment" while explaining why the aided-by-agency exception didn't apply).

of his employment as a deputy sheriff."); *Zsigo*, 716 N.W.2d at 229 ("[N]ursing assistant" who "engaged in acts of sexual misconduct" was "clearly not acting within the scope of his employment."). The facts here fit that high-level mold: Robinson, in a role of which trust is expected and to which authority is vested, committed sexually improper acts against a patient in her care. And second, based on that factual categorization, the court in both *Hamed* and *Zsigo* declared that there was "no question" and that it was "clear" that the defendants were outside the scope of their employment. *Hamed*, 803 N.W.2d at 244; *Zsigo*, 716 N.W.2d at 229 (citation modified); *see also supra* note 9 (explaining how *Hamed* and *Zsigo* treated allegations of sexual assault by authority figures as categorically outside the scope of employment). Applying those two features here, Dr. Robinson's conduct falls outside the scope of her employment.

The cases that Cholewa counters with aren't convincing. None of them have anything to say about Michigan law. *See Simmons v. United States*, 805 F.2d 1363, 1368 (9th Cir. 1986) (discussing Washington agency law); *St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 700 (Minn. 1990) (discussing Minnesota contract law). And one of them simply "assumed" that the defendant-employee was within the scope of employment in a footnote without any further analysis. *Benavidez v. United States*, 177 F.3d 927, 928 n.2 (10th Cir. 1999).

## C.

Finally, we turn to Dr. Robinson's argument that the district court's grant of immunity on *some* claims automatically triggers immunity as to *all* claims. We're not convinced. A sweeping all-or-nothing immunity finds no support in either the Westfall Act's text, federal judicial practice, or the *Cholewa I* opinion.[9]

---

[9] It appears that Dr. Robinson abandoned on appeal the version of her argument based on the Westfall Act's text. Instead, her brief focuses on the *Cholewa I* panel's opinion, arguing that the

Start with the Westfall Act's text. It commands two procedural steps "[u]pon certification by the Attorney General" or "by the court" that "the defendant employee was acting within the scope of [her] office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d). First, "any civil action or proceeding commenced upon such claim . . . shall be deemed an action against the United States." *Id.* And second "the United States shall be substituted as the party defendant." *Id.*

So the statute speaks simultaneously of "civil action[s] or proceeding[s]" and of "claims." *Id.* How are the two related? The Act's text makes clear that claims are the base units that compose actions. That accords with other provisions bearing directly on federal immunity, *see id.* § 1346(b) (vesting exclusive jurisdiction in the federal courts over "civil actions on claims against the United States, for money damages"), and other general jurisdictional statutes, *see id.* § 1441(c) (providing for removal of "civil action[s]" that "include[]" federal-question "claim[s]"). *See also Weekley v. Guidant Corp.*, 392 F. Supp. 2d 1066, 1067 (E.D. Ark. 2005) (further discussing the nature of actions and claims).

So which of the Act's two commands apply to "civil actions" and "claims," respectively? The first is easy. The Act requires courts to "deem[] [the certified] *action* against the United States." 28 U.S.C. § 2679(d)(1) (emphasis added). In other words, the court must implead the United States as a party defendant. But that doesn't help Dr. Robinson, because it doesn't mean that *only* the United States can proceed as defendant. After all, civil actions can be brought against a technically unlimited number of defendants (with a slight nuance for class actions). *See* Fed. R. Civ. P. 20 (allowing for joinder of any number of defendants so long as "any right to relief is

___

all-or-nothing approach is the "law of this case" on her reading of that decision. Appellant Br., p.11.

asserted against them" in common and "any question of law or fact common to all defendants will arise in the action").

The second command—which requires courts to "substitute[]" the United States as "the party defendant"—is a bit trickier. 28 U.S.C. § 2679(d)(3). The party defendant as to *what*? The whole civil action—effectively forcing out any other defendant, as Dr. Robinson wants? Or that part of the action based on the certified claim(s)?

Two of the Act's other subparagraphs help resolve the ambiguity. First, § 2679(d)(4) provides that "any action" subject to the Act "shall proceed in the same manner as any action against the United States filed pursuant to [the Federal Tort Claims Act (FTCA)]." And the FTCA applies to only "civil actions on *claims* against the United States." *Id.* § 1346(b)(1) (emphasis added). Second, § 2679(d)(5) applies "[w]henever an action or proceeding in which the United States is substituted as the party defendant under [the Act] is dismissed for failure first to *present a claim*" by reason of the FTCA's exhaustion requirements. *Id.* § 2679(d)(5) (emphasis added).

Both those excerpts show that Congress used the term "action" in the Act only to encompass that part of the action embracing certified claims. If we held otherwise, both sections could result in legal impossibilities. Imagine a scenario in which a plaintiff files an action including two claims against the employee-defendant: one tort claim for within-scope conduct, and an unrelated breach-of-contract claim—something he can do under Rule 18. Following Dr. Robinson's all-or-nothing interpretation, (d)(4) would mean that the unrelated *contract* claim would suddenly become an "action against the United States" under the Federal *Tort* Claims Act— a legal impossibility. It's a similar story for (d)(5). That subparagraph contemplates that an "action or proceeding" can be dismissed against the United States after certification for failure to comply with the FTCA's exhaustion requirement. Continuing with the same example, Dr. Robinson's

interpretation would mean that Congress thought that our hypothetical plaintiff's *whole case*—including the contract claim—could be dismissed for failure to comply with the FTCA's exhaustion requirements. In other words, the statute doesn't say that the *whole* "civil action or proceeding" must be deemed against the United States, but that "any civil action or proceeding commenced upon such a claim"—meaning one arising out of within-scope conduct—shall be so deemed. *Id.*

The only federal court (as far as we know) to address the issue agrees. In *Lyons v. Brown*, the First Circuit had to "determine the 'unit' for which certification is appropriate under the Westfall Act." 158 F.3d 605, 607 (1st Cir. 1998). There, the plaintiff's complaint included charges that "encompasse[d] multiple incidents." *Id.* at 608. Even so, the government certified "discrete incidents" within each count. *Id.* at 609. The *Lyons* court remanded for the district court to consider immunity for each discrete incident—explicitly contemplating that it could conclude that immunity is appropriate for some incidents but not others. *Id.* And other courts implicitly take the same approach. *See, e.g.*, *Jordan v. Carter*, 739 F. Supp. 3d 647, 658 & n.6 (S.D. Ohio 2024) (declining to substitute federal-employee defendant as to contract claims pleaded alongside tort claims).

Moreover, we haven't found (and Dr. Robinson hasn't identified) any court that has adopted a one-claim-immunizes-the-rest approach when dealing with any other immunity doctrine. In fact, we've found the opposite. For example, in the context of sovereign immunity for Indian tribal officials, the Eleventh Circuit reversed a district court's application of an all-or-nothing approach. *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 886–87 (11th Cir. 2024). There, the district court "ruled that several reasons that relate to *different* claims . . . warranted applying [immunity] for *all* claims against the [tribal] officials." *Id.* at 886 (emphasis added). But,

22

as the Eleventh Circuit explained, "federal courts must examine each claim in a case to see if sovereign immunity bars jurisdiction." *Id.* at 887 (citation modified). Similarly, in our circuit, we held (in an unpublished opinion) that state sovereign immunity in Americans with Disabilities Act cases applies on a "claim-by-claim basis." *Doe v. Tennessee*, No. 24-5280, 2024 WL 5498154, at *4 (6th Cir. Oct. 28, 2024) (order) (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)). The same goes for other courts dealing with other species of immunity doctrines. *See, e.g.*, *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 590 n.2 (9th Cir. 2020) (Foreign Sovereign Immunities Act). So it's routine for lawsuits to proceed against defendants on claims on which they're not entitled to immunity, even if they've received immunity on other claims.

At bottom, Dr. Robinson asks us to read the Westfall Act at variance with its own text, judicial practice applying the Act, and the federal courts' general approach to immunity doctrines. "No such design can be attributed to a rational Congress," so we won't adopt it here. *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013); *see also Castillo v. Bondi*, 140 F.4th 777, 785 (6th Cir. 2025) (Thapar, J., concurring) (noting result commanded by decades-old judicial precedent that "no rational Congress could have intended").

Finally, Dr. Robinson argues that the earlier panel's decision establishes that "the law of this case" required the district court to determine whether Robinson acted within the scope of her employment "with regard to the suit as a whole." Appellant Br., p.11. It didn't. The *Cholewa I* panel expressly disclaimed "a position on any consequence of substituting the United States as to some, but not all, of the claims." *Cholewa I*, 2024 WL 869550, at *4. And the final paragraph of that opinion directed the district judge to substitute the United States only as to the within-the-scope "claim or claims"—meaning the substitution could plausibly envelop only a few claims. *Id.* And aside from her law-of-the-case rationale, Dr. Robinson hasn't briefed a freestanding theory

as to why the Westfall Act immunizes outside-the-scope conduct simply because the plaintiff decided to plead it in parallel to within-the-scope conduct.

### III.

For these reasons, we AFFIRM.